Filed 1/26/16

**CERTIFIED FOR PUBLICATION IN OFFICIAL REPORTS**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| HIGHLAND SPRINGS CONFERENCE AND TRAINING CENTER et al., | E060915 |
| Plaintiffs and Appellants, | (Super.Ct.No. RIC460950) |
| v. | O P I N I O N |
| CITY OF BANNING, | |
| Defendant and Respondent; | |
| SCC ACQUISITIONS, INC. et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from the Superior Court of Riverside County. Thomas H. Cahraman, Judge. Reversed.

Chatten-Brown & Carstens, Joshua R. Chatten-Brown, Jan Chatten-Brown, and Douglas P. Carstens for Plaintiff and Appellant Highland Springs Conference and Training Center.

Leibold McClendon & Mann and John G. McClendon for Plaintiff and Appellant Banning Bench Community of Interest Association.

Aleshire & Wynder, Anthony R. Taylor and James J. McGrath for Defendant and Respondent.

Voss, Cook & Thel, Francis T. Donohue III; Bruce V. Cook and Andrew P. Cook for Real Party in Interest and Respondent SCC Acquisitions, Inc.

No appearance for Real Party in Interest and Respondent SCC/Black Bench, LLC.

## I.  INTRODUCTION

In these consolidated California Environmental Quality Act (CEQA) actions, several plaintiffs, including plaintiffs and appellants Highland Springs Conference and Training Center (Highland Springs) and Banning Bench Community of Interest Association (Banning Bench) successfully challenged the certification by defendant and respondent, City of Banning (the City), of an environmental impact report (EIR) for a 1,500-acre real estate development project known as the Black Bench project.  (Pub. Resources Code, § 21000 et seq.)  In their writ petitions, filed in November 2006, Highland Springs and Banning Bench named "SCC/Black Bench, LLC, dba SunCal Companies" (SCC/BB), as the only real party in interest.  (Pub. Resources Code, § 21167.6.5.)

SCC/BB appealed the April 2008 judgments entered in favor of plaintiffs on their writ petitions, but its appeal was dismissed in September 2008 after it failed to deposit the costs of preparing the record on appeal.  (Cal. Rules of Court, rule 8.140.)  By that time,

SCC/BB was in default on two purchase money loans for the Black Bench property, and by the end of 2008 SCC/BB lost the property in foreclosure.

In August 2008, Highland Springs and Banning Bench, along with two other plaintiffs, jointly moved to recover their attorney fees and costs incurred in the CEQA litigation from SCC/BB. In October 2008, the trial court awarded the moving plaintiffs over $1 million in attorney fees and costs. (Code Civ. Proc., § 1021.5.)[1] SCC/BB did not oppose the motion. In October 2012, the four plaintiffs, including Highland Springs and Banning Bench, jointly moved to amend the judgments to add SCC Acquisitions, Inc. (SCCA) as an additional judgment debtor (§ 187), and make SCCA liable for paying the attorney fees and costs awards. The plaintiffs claimed that SCCA was the alter ego of SCC/BB, it would be unjust not to hold SCCA liable for paying the attorney fees and costs awards, and plaintiffs did not discover until 2012 that SCC/BB had been dissolved in 2010.

Following initial and supplemental briefing, three hearings, and several rounds of evidentiary submissions, the trial court, relying on *Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 47-48 (*Alexander*), denied the motion to amend the judgments on the sole basis that plaintiffs failed to act with due diligence in bringing the motion. The court reasoned plaintiffs knew, or reasonably should have known, of SCCA's alleged alter ego relationship to SCC/BB long before plaintiffs moved to amend the judgments in

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

October 2012.  Still, the court indicated the equities favored granting the motion and the court "likely" would have granted it had it been filed earlier.

In this appeal, Highland Springs and Banning Bench claim the motion to amend their judgments was erroneously denied.  They claim SCCA failed to demonstrate that it was prejudiced by plaintiffs' over four-year delay in filing the motion; they presented ample evidence that SCCA controlled the CEQA litigation against SCC/BB; SCCA was the alter ego of SCC/BB, and it would be unjust not to hold SCCA liable for paying their attorney fees and costs awards against SCC/BB.

We agree the motion to amend was erroneously denied based solely on plaintiffs' delay in filing the motion, because SCCA made an insufficient evidentiary showing that it was prejudiced by the delay.  SCCA did not meet its burden of proving the motion was barred by laches.  (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 (*Miller*).)  We therefore reverse the order denying the motion and remand the matter to the trial court for further proceedings.  On remand, the trial court must determine whether the judgments in favor of Highland Springs and Banning Bench should be amended to add SCCA as an additional judgment debtor.

## II.  BACKGROUND

A. *The CEQA Litigation and the Attorney Fees and Costs Awards*

In 2006, the City certified an EIR, approved a general plan amendment and a specific plan, and took other actions in approving the development of an approximate 1,500-acre property known as the Black Bench Ranch, located in the City and just south

of the San Bernardino National Forest. In November 2006, Highland Springs, Banning Bench, and three other plaintiffs filed four separate CEQA actions challenging the City's certification of the EIR and other project approvals. The actions were later consolidated, apparently for all purposes.

In April 2008, the trial court issued judgments and peremptory writs of mandate, setting aside and vacating the City's certification of the EIR and related project approvals. As noted, SCC/BB appealed, but its appeal was dismissed in September 2008 after it failed to deposit the costs of preparing the record on appeal. (Cal. Rules of Court, rule 8.140.) The remittitur in SCC/BB's appeal was issued in November 2008.

Meanwhile, in August 2008, Highland Springs, Banning Bench, and two of the three other plaintiffs, namely the two Cherry Valley entities,[2] filed motions to recover, solely from SCC/BB, their attorney fees and costs incurred in challenging the EIR and related project approvals. SCC/BB did not oppose the motion, and the City joined the motion.

By September 2008, it was apparent to all of the parties to the CEQA litigation that SCC/BB was having financial difficulties. In a notice of nonopposition to the attorney fees motions, filed in September 2008, the City represented that, while the City

---

[2] The three other plaintiffs were the Center for Biological Diversity, Cherry Valley Pass Acres and Neighbors, and Cherry Valley Environmental Planning Group. The two Cherry Valley entities filed a single writ petition and joined the motion to amend the judgments. The Center for Biological Diversity did not join the motion to amend the judgments, and the two Cherry Valley entities did not appeal the order denying the motion.

was engaged in discussions with SCC/BB to resolve the matter of SCC/BB's contractual obligation to reimburse the City for the City's attorney fees and costs incurred in the CEQA litigation, "[*i*]*t became readily apparent . . . that the Real Party* [*SCC/BB*] *was in financial distress. Real Party defaulted on both its loans for the property where the proposed project was to* [*be*] *built, and on its agreement to defend and indemnify the City in this litigation.*" (Italics added.) The City explained it was supporting plaintiffs' motion for attorney fees and costs because a settlement agreement between the City and plaintiffs allowed the City to be reimbursed by Banning Bench for certain attorney fees and costs the City paid to Banning Bench, providing that Banning Bench was able to recover those amounts from SCC/BB.

In October 2008, the trial court awarded $1,081,545.97 in attorney fees to the four moving plaintiffs and against SCC/BB: Highland Springs was awarded $412,819.96; Banning Bench was awarded $288,920.01; and the two Cherry Valley entities were awarded $379,806.

B. *The Motion to Amend the Judgments*

In October 2012, Highland Springs, Banning Bench, and the two Cherry Valley entities moved to add SCCA to the judgments as an additional judgment debtor and render SCCA liable for paying their attorney fees and costs awards. (§ 187.) By October 2012, no part of the awards had been paid. The trial court denied the motion and later denied plaintiffs' motion for a new trial. Only Highland Springs and Banning Bench appealed. (§ 904.1, subd. (a)(2).)

In their motion to amend, plaintiffs claimed SCCA was the alter ego of SCC/BB and it would be unjust not to hold SCCA liable for paying plaintiffs' attorney fees and costs awards. Plaintiffs presented evidence that both SCCA and SCC/BB conducted business under the names "SunCal" and "The SunCal Companies," in connection with procuring the Black Bench property, obtaining the project approvals, and in the CEQA litigation. Plaintiffs adduced a fictitious business name statement, recorded in Orange County on June 1, 2006, showing that "SCC Acquisitions, Inc.," or SCCA, conducted business as "SunCal Companies," and claimed that "[r]eview of documents regarding the history of the project" showed that "SunCal" was the entity that applied to the City to develop the property; "SunCal" was identified as the property owner in the City's notice of scoping meeting preceding the City's preparation of the EIR; and reports prepared for the EIR were prepared for "SunCal," not SCC/BB.

Plaintiffs also adduced letters and correspondence indicating that SunCal or SCCA was involved in negotiating the project approvals with the City and in attempting to settle the matter of plaintiffs' attorney fees claims and awards. For example, in September 2006, Edward J. Casey, counsel for SCCA and the attorney of record in the CEQA litigation for SCC/BB, wrote a letter to the City, "'on behalf of [the] Suncal Companies ("Suncal"),'" whom Mr. Casey identified as "'the project applicant for the Black Bench Specific Plan,'" urging the city council to approve the project. Plaintiffs presented additional evidence that SCC/BB and SCCA had the same chief executive officer, agent for service of process, and principal executive office. Over 70 other business entities,

many with "SCC" in their names, also had the same office address and agent for service of process as SCCA and SCC/BB.

Plaintiffs argued that common representatives of SCCA and SCC/BB, including Mr. Casey, misled them concerning which of the two entities was the project applicant and "real party in interest" in the CEQA litigation. (Pub. Resources Code, § 21167.6.5, subd. (a).) Plaintiffs claimed they intended to name SCCA as a real party in interest in their November 2006 writ petitions, along with SCC/BB, but did not do so because counsel for SCCA and SCC/BB, Mr. Casey, confirmed in a November 16, 2006, e-mail to counsel for Highland Springs, Jan Chatten-Brown, that "Suncal" (which plaintiffs understood to mean SCCA) held "no interest" in the Black Bench property. Plaintiffs claimed Mr. Casey's representation was false, in part because SCCA, not SCC/BB, was the party with whom the City and plaintiffs believed they were dealing in connection with the Black Bench project approvals. Plaintiffs submitted that, had they known when they filed their writ petitions in November 2006, that SCCA owned 65 to 70 percent of SCC/BB—a fact not disclosed by SCCA until one of the hearings on the motion to amend the judgments—they would have named SCCA as a real party in interest in their petitions.

C. *SCCA's Opposition*

In opposing the motion, SCCA denied it was the alter ego of SCC/BB and claimed SCC/BB "was formed and kept as a separate entity, with its own assets, its own bank accounts, and its own accounting." "All corporate formalities were followed," and

SCC/BB "was not 'undercapitalized.'" SCCA did not dispute that its representatives used the names "SunCal" and "SunCal Companies" interchangeably, and to refer to SCCA, SCC/BB, and other SunCal entities. SCCA was "one of the parent companies" of many "SunCal entities," and for this reason conducted business under the fictitious business name "SunCal Companies." "SunCal" was not a "legal entity," but, like Coca-Cola and McDonald's, was a "brand name for a business that operate[d] through multiple legal entities," and "[a]lmost all, if not all, real estate developers and home builders operate[d] in the same manner."

SCCA explained that "single purpose entit[ies]," like SCC/BB, were commonly used in the real estate development industry. SunCal's practice had been "to hold and own property in a variety of wholly owned and partially owned subsidiaries and joint ventures with equity and debt capital provided by institutional investors, including at one time . . . Lehman Brothers [(Lehman)] . . . ." SCCA would enter into purchase contracts with property sellers, or take an assignment of a purchase contract already in place, then assign its purchase rights to "a newly formed single purpose entity" in which SCCA typically had an indirect ownership interest, "at times no more than 5%." The property would then be purchased by the newly formed single purpose entity, and "the development is then owned, operated and pursued by such entity." The reasons for such "practices and structure" included "limiting liability with respect to a real estate development to that specific development, as is common in the real estate industry," and "satisfying [the] requirements of capital partners and lending sources that will not invest

in or lend to projects unless the ownership of the project is held by what is termed as a single purpose entity, as such financing sources demand that any such entity have no liability with respect to any other projects."

The Black Bench property was acquired in four separate transactions with four property owners, and SCCA either entered into contracts with the property owners or acquired the rights to purchase the property from unrelated third parties. After forming SCC/BB, SCCA assigned its rights to purchase the Black Bench property to SCC/BB, which then took title to the entire property. The acquisition of the property was financed through "seller carry-back financing" and equity contributions from SCC/BB's "immediate member (not SCCA)," which member was formed as a vehicle through which various projects, including the Black Bench project, were financed. During one of the hearings on the motion to amend the judgments, counsel for SCCA revealed that SCCA owned 65 to 70 percent of SCC/BB.

After SCC/BB acquired the Black Bench property, the "development work" was performed under a contract between SCC/BB and "SunCal Management, LLC." As its name suggested, SunCal Management, LLC was "affiliated with the SunCal organization," and had "the necessary personnel and business infrastructure to perform such development." This was "routine and customary" in the real estate development industry. SCC/BB, "having no employees, could not have performed such development services by itself."

Still, "[a]ll contracts for entitlement and development services" for the Black Bench property were entered into by SCC/BB, not SCCA or SunCal Management, LLC. SCC/BB paid all amounts owing under such contracts from its own bank accounts, using its own funds. SCC/BB also paid its attorneys to defend the CEQA litigation from its own funds, using its own bank accounts.

SCC/BB "spent over $14 million of its own funds to entitle and develop" the Black Bench property, "all of such funds being equity contributions from its member." This member "changed over the life of the [p]roject due to changes in financing arrangements. The member . . . received loan proceeds, either directly or indirectly, from lenders to finance various projects, which proceeds were then contributed as capital to the single purpose entities that owned those projects, one of which was SCC/Black Bench."

SCCA also pointed out that the CEQA litigation was filed in November 2006, and during the next two years, "the housing market in the United States generally, and in Banning in particular, completely collapsed." SCC/BB was "left with a partially entitled [p]roject that was worth substantially less than what it had paid to acquire and entitle the [p]roject. Despite the millions of dollars that SCC/Black Bench had invested in the . . . [p]roperty, due to the collapse of the real estate market, the seller carry-back financing went into default and the [p]roject was foreclosed on in 2008. As a result, SCC/Black Bench lost its entire investment in the [p]roject."

SCCA argued it would be inequitable and would violate its due process rights to impose alter ego liability on it and hold it responsible for plaintiffs' attorney fees and

costs awards against SCC/BB. "Perhaps more importantly," SCCA claimed, it was not given the opportunity to defend the alter ego claim during the CEQA litigation. SCCA maintained that, "[a]t the very least, if SCCA were named as a defendant in the original action six years ago, documents would have been more readily available and memories would have been fresh in the minds of witnesses." SCCA did not indicate that any documents, witness testimony, or other evidence had been lost or was no longer available.

D. *Additional Briefing and Evidence*

The motion to amend came was heard on December 12, 2012, but the hearing was continued to March 27, 2013, then to November 20, 2013. The second continuance was granted in order to allow the parties to pursue discovery and present additional and rebuttal evidence. Before the continued hearings, plaintiffs and SCCA each filed supplemental briefs and submitted additional evidence.

E. *The Court's Ruling on the Motion to Amend*

In a five-page ruling issued on January 27, 2014, the court, relying on *Alexander,* denied the motion to amend based solely on plaintiffs' delay or "lack of due diligence" in bringing the motion. The court explained: "The motion was filed more than four years after issuance of the orders imposing attorney's fees, and almost six years after the commencement of [the] action. [(*Alexander*, *supra*, 104 Cal.App.3d 39.)] While [plaintiffs] may have been misled at the start of the litigation, there is [in]sufficient evidence to justify such a long delay. They should have discovered the relevant facts

long ago." The court also noted that, though SCCA did not expressly argue "lack of due diligence" or prejudice in its opposition brief, it discussed the "same issue" in two paragraphs of its original opposition brief under the heading "'due process.'"

The court next observed that: "Absent the delay this court would likely have granted the motion. Edward Casey's e-mail of November 16, 2006 indeed appears to be misleading, though the court cannot tell whether he intended to mislead anyone. Further, although $14 million is a substantial sum, it appears to represent undercapitalization for a project of this size. One can easily infer from the administrative record that the overall value of the completed project would have been in the range of $300-$700 million. Most of the other points made by [plaintiffs] have merit as well, and of course it was elucidating to learn at the hearing that the interest of SCCA in SCC/Black Bench was 65-70%, not the 5% that was implied by the opposition brief. The opposition paperwork talks about the business habits of major developers, and the many entities covered by the brand name, 'SunCal,' but the fact that other developers may also use underfunded subsidiaries to limit their liability, and generic brand names that create confusion, provides no particular basis to have absolved [SCCA]. When one then considers that SCC/Black Bench had no employees, but had a large overlap of officers with SCCA, and further considers the role of SCCA in the underlying litigation, it seems likely that the motion would have been appropriately granted, had it been filed earlier."

F.  *Plaintiffs' Motion for a New Trial*

Following the denial of the motion to amend, plaintiffs filed a motion for a new trial along with additional evidence.  (§ 657.)  That motion was denied following a March 21, 2014, hearing.

G.  *The Trial Court's Evidentiary Rulings*

SCCA made numerous evidentiary objections to plaintiffs' evidence, principally on foundational and hearsay grounds.  The court sustained some of the objections, and plaintiffs challenge those rulings on this appeal.  For the most part, plaintiffs claim that what would otherwise have constituted hearsay was admissible for the nonhearsay purpose of showing why plaintiffs' representatives did what they did at various points in time, and ultimately waited until October 2012 to file the motion to amend their judgments.

We find it unnecessary to address the court's many evidentiary rulings.  All of the excluded evidence concerned the reasons plaintiffs waited until October 2012 to file the motion to amend and whether their delay in filing the motion was unreasonable.  As will appear, the question of whether plaintiffs unreasonably delayed in filing the motion to amend is irrelevant to the merits of plaintiffs' alter ego claim against SCCA.  It is only relevant to whether plaintiffs' alter ego claim was barred by the equitable, affirmative defense of laches.  As we explain, the claim is not barred by laches because SCCA failed to present sufficient evidence that it was prejudiced by plaintiffs' delay in filing the motion, even if the delay was unreasonable.

III.  DISCUSSION

A.  *Applicable Law and Standard of Review*

Section 187 grants every court the power and authority to carry its jurisdiction into effect.**3**  (*NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778.)  This includes the authority to amend a judgment to add an alter ego of an original judgment debtor, and thereby make the additional judgment debtor liable on the judgment.  (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1106.)  Amending a judgment to add an alter ego of an original judgment debtor "'is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant.'"  (*McClellan v. Northridge Park Townhome Owners Assn.* (2001) 89 Cal.App.4th 746, 752.)

Section 187 contemplates amending a judgment by noticed motion.  (*Wells Fargo Bank, N.A. v. Weinberg* (2014) 227 Cal.App.4th 1, 9 [Fourth Dist., Div. Two] (*Wells Fargo*); see §§ 1003, 1004, 1005, subd. (a)(13)].)  The court is not required to hold an evidentiary hearing on a motion to amend a judgment, but may rule on the motion based solely on declarations and other written evidence.  (*Wells Fargo*, *supra*, at p. 9.)

---

**3**  Section 187 states:  "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most comfortable to the spirit of this code."

To prevail on the motion, the judgment creditor must show, by a preponderance of the evidence, that: "(1) the parties to be added as judgment debtors had control of the underlying litigation and were virtually represented in that proceeding; (2) there is such a unity of interest and ownership that the separate personalities of the entity and the owners no longer exist; and (3) an inequitable result will follow if the acts are treated as those of the entity alone." (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 815-816.)  The decision to grant or deny the motion lies within the sound discretion of the trial court (*id*. at p. 815) and will not be disturbed on appeal if there is a legal basis for the decision and substantial evidence supports it.  (See *People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1552.)

In determining whether there is a sufficient unity of interest and ownership, the court considers many factors, including "the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of the other.  [Citation.]" (*Troyk v. Farmers Group, Inc*. (2009) 171 Cal.App.4th 1305, 1342.)  Inadequate capitalization of the original judgment debtor is another factor.  (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811-812 [reciting "long list" of inexhaustive factors].)  No single factor governs; courts must consider all of the circumstances of the case in determining whether it would be equitable to impose alter ego liability.  (*Troyk v. Farmers Group, Inc.*, *supra*, at p. 1342.)

Alter ego "is an extreme remedy, sparingly used." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539.) "'The standards for the application of alter ego principles are high, and the imposition of [alter ego] liability . . . is to be exercised reluctantly and cautiously.'" (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 306 (dis. opn. of Lucas, J.).) Still, "'[t]he greatest liberality is to be encouraged'" in allowing judgments to be amended to add the "real defendant," or alter ego of the original judgment debtor, "'in order to see that justice is done.'" (*Carr v. Barnabey's Hotel Corp.* (1994) 23 Cal.App.4th 14, 20; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508 (*Greenspan*); *Wells Fargo*, *supra*, 227 Cal.App.4th at p. 7.)

In *Kohn v. Kohn* (1950) 95 Cal.App.2d 708, a marriage dissolution case discussed in *Greenspan*, the court emphasized the case-specific nature of determining whether to impose alter ego liability: "'"The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." . . . "In the instant case there may well have been various business reasons sufficient to justify and support the formation or continuation of the corporation on the part of defendant. For such purposes the [corporation] still stands." . . . However, to the extent the purpose of the corporation was to fraudulently deprive the wife of a fair property settlement, the

corporate entity would be disregarded:  "The law of this state is that the separate corporate entity will not be honored where to do so would be to defeat the rights and equities of third persons." . . . .'"  (*Greenspan*, *supra*, 191 Cal.App.4th at p. 511.)

B.  *The Order Denying the Motion to Amend the Judgments Must be Reversed*

Plaintiffs claim the court erroneously denied their motion to amend the judgments to add SCCA as a judgment debtor based solely on plaintiffs' lack of due diligence, or unreasonable four- to six-year delay, in filing the motion.  We agree.

1.  The Motion to Amend Was Not Barred by Laches

Laches is an equitable, affirmative defense which requires a showing of both an unreasonable delay by the plaintiff in bringing suit, "'"plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' [Citation.]"  (*Miller*, *supra*, 27 Cal.3d at p. 624; *Mt. San Antonio Community College Dist. v. Public Employment Relations Bd.* (1989) 210 Cal.App.3d 178, 188.)  "If, in light of the lapse of time and other relevant circumstances, a court concludes that a party's failure to assert a right has caused prejudice to an adverse party, the court may apply the equitable defense of laches to bar further assertion of the right."  (*In re Marriage of Fellows* (2006) 39 Cal.4th 179, 183.)

The party asserting laches bears the burden of production and proof on each element of the defense.  (*Miller*, *supra*, 27 Cal.3d at p. 624.)  It is important to remember that, in determining whether laches applies, "[p]rejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof

and the production of evidence on the issue.  [Citation.]  Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances . . . .  [Citations.]"  (*Ibid*.)

The trial court here denied plaintiffs' motion to amend based solely on plaintiffs failure to exercise due diligence, or unreasonable delay, in filing the motion.  The court observed the motion was filed on October 26, 2012, slightly more than four years after October 23, 2008, the date the most recent postjudgment attorney fee award order was issued, and nearly six years after plaintiffs' writ petitions were filed in November 2006.  As noted, the court found "[in]sufficient evidence to justify" plaintiffs' "long delay" in filing the motion, and observed that plaintiffs "should have discovered the relevant facts long ago."

The court also found that SCCA was prejudiced by the delay, but insufficient evidence supports this finding.  The court reasoned that SCCA had "*presumably . . . planned its affairs*" since 2006 to 2008 "*without reference*" to any risk that it would be held liable for plaintiffs' attorney fees awards.  (Italics added.)  But prejudice can never be presumed; it must be affirmatively shown (*Miller*, *supra*, 27 Cal.3d at p. 624), and here, SCCA presented insufficient evidence that it was prejudiced by plaintiffs' delay in moving to amend the judgments to add SCCA as an additional judgment debtor.  Though it may seem fair and reasonable to presume prejudice based solely on a party's unreasonable delay in asserting a right, particularly when, as here, the relevant facts were

known to or should have been discovered by the party asserting the right, prejudice simply may not be presumed based solely on an unreasonable delay in asserting the right.

In concluding SCCA was prejudiced, the court pointed to two paragraphs on page 8 of SCCA's original opposition brief as "discussing" "[p]rejudice from [the] delay." There, SCCA argued that if had it been named, along with SCC/BB, as an original defendant or real party in interest in the CEQA litigation in November 2006, then SCCA "could have expended its own resources to defend the litigation, including any claim of alter ego, which resources would have been substantial in 2006 to 2008 when the litigation was ongoing. But now, due to the collapse of the real estate housing market, circumstances are much different. Adding SCCA now, six years after the litigation was filed and over four years after the judgment[s] for attorneys' fees was litigated and entered, and with SCCA's circumstances having materially changed in the interim, would violate SCCA's right to due process."

This was insufficient to show prejudice. It was not enough for SCCA to simply assert, without specifics or supporting evidence, that it no longer had the same resources it had before the real estate market "collapsed" in 2008 and that other unspecified "circumstances [had] materially changed." SCCA did not show that any evidence relevant to its defense to the motion had been lost or destroyed or that any witnesses were no longer available. (Cf. *Pratali v. Gates* (1992) 4 Cal.App.4th 632, 644 (*Pratali*) [death of key witness may constitute prejudice].) To the contrary, it appears that little to no

relevant evidence concerning SCCA's relationship to SCC/BB, and the equities of imposing alter ego liability on SCCA, had been lost or destroyed since 2008.

Indeed, SCCA did not even argue it was prejudiced by plaintiffs' four-year delay in filing the motion to amend, or plaintiffs' near six-year delay in attempting to bring SCCA in as a party to the consolidated CEQA actions. Rather, SCCA claimed its due process rights would be violated if it were forced to defend the motion so long after plaintiffs *could have* asserted their alter ego claim against SCCA in the CEQA actions. But whether SCCA's due process rights would be violated by imposing alter ego liability upon it—that is, whether SCCA controlled the underlying CEQA litigation and was virtually represented in the consolidated CEQA actions—is a different question than whether SCCA was prejudiced by plaintiffs' delay in filing the motion to amend. Because insufficient evidence shows that SCCA was prejudiced by plaintiffs' four-year delay in filing their motion to amend, the motion is not barred by laches.

2. *Alexander* is Inconsistent with Settled Case Law on Laches

In denying the motion to amend, the court relied on *Alexander.* Plaintiffs claim *Alexander* is "an outlier; an anomalous departure from settled case law" and in relying on it the court created an impermissible "*ad hoc* statute of limitation[s]" to bar their motion to amend the judgment. We agree that *Alexander* is a departure from settled case law. The plaintiffs in *Alexander* obtained two judgments against a corporation, Abbey of the Chimes (Abbey), one on a promissory note signed by Abbey and another on assignment of commissions owed by Abbey. (*Alexander*, *supra*, 104 Cal.App.3d at pp. 42-43.)

Abbey incurred the obligations before McCormac, an individual, became its sole shareholder in 1965. (*Id*. at p. 43.) In 1966, the plaintiffs sued Abbey on the note and on the assignment, without naming McCormac as a defendant, and judgments in favor of the plaintiffs were entered in February 1971. (*Id*. at pp. 42-43.) Meanwhile, in 1969, McCormac sold Abbey's assets in a bulk sale transfer to another corporation, Skylawn, and the sales agreement required Skylawn to assume Abbey's liability for paying the judgments. (*Id*. at p. 43.) The plaintiffs never attempted to satisfy their judgments against Abbey or Skylawn. (*Ibid*.)

In 1977, nearly seven years after the judgments were entered, the plaintiffs moved to amend the judgments to add McCormac as a judgment debtor, claiming he was Abbey's alter ego. (*Alexander*, *supra*, 104 Cal.App.3d at p. 43.) The trial court granted the motion. (*Id*. at p. 42.) On appeal, McCormac claimed his due process rights had been violated because he was not present at the underlying trial. (*Id*. at p. 44.) The *Alexander* court rejected this claim, finding there was sufficient evidence that McCormac controlled the underlying litigation. (*Id*. at pp. 44-46.) The court also found sufficient evidence to support a finding that McCormac was Abbey's alter ego, and it would be unjust not to hold McCormac liable for the judgments, given that he caused Abbey to sell all of its assets, leaving Abbey it "a hollow shell without means to satisfy its existing and potential creditors." (*Id*. at pp. 46-47.) Nonetheless, the court reversed the order amending the judgments on the sole ground that the motion was untimely, while emphasizing that the alter ego doctrine was an equitable one and that the court's task in applying it was to

ensure a just and equitable result.  (*Id*. at pp. 47-48.)  The court reasoned it was inequitable to hold McCormac liable as an alter ego of Abbey, given the plaintiffs' seven-year delay in filing the motion to amend, when there was no explanation for the delay, the plaintiffs never attempted to satisfy their judgments against Abbey or Skylawn, and the plaintiffs knew that McCormac was Abbey's sole shareholder and alleged alter ego when they filed their complaints against Abbey.  (*Id*. at p. 48.)

The *Alexander* court did not use the term "laches" in reversing the order amending the plaintiffs' judgments.  (*Alexander, supra,* 104 Cal.App.3d at pp. 47-48.)  Specifically, the court did not require McCormac to show he was prejudiced by the plaintiffs' unexplained, seven-year delay in filing the motion to amend.  (*Miller, supra,* 27 Cal.3d at p. 624.)  *Alexander* is thus inconsistent with settled case law that an action is barred by laches only if the defendant shows the plaintiff unreasonably delayed in bringing suit, and the defendant was either prejudiced by the delay or the plaintiff acquiesced in the actions it complains of.  (*Miller*, *supra*, 27 Cal.3d at p. 624; *Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 & fn 8.)[4]

---

[4]  *Alexander* relied on *McIntire v. Superior Court* (1975) 52 Cal.App.3d 717, 721 for the proposition that:  "[T]o justify the addition of new defendants, plaintiffs must have acted with due diligence to bring them in as parties."  *McIntire* involved a motion to *amend a complaint* to add defendants following trial and judgment in a personal injury action.  (*Id*. at p. 719.)  The *McIntire* court held that the trial court abused its discretion in allowing the amendment, both because the court had not retained jurisdiction in the cause and because the plaintiffs unreasonably delayed in bringing the McIntires in as defendants, and prejudice to the McIntires, as a result of the delay, was "evident."  (*Id*. at pp. 720-721.)  Thus, *McIntire* found sufficient evidence of prejudice resulting from the delay, but this aspect of *McIntire* was not noted in *Alexander*.  Other courts have cited *Alexander* for the bare proposition that a motion to amend a judgment to add a judgment

*[footnote continued on next page]*

Nor can *Alexander* be understood as a proper refusal by the court to apply the alter ego doctrine based on the overall equities of the case.  To be sure, whether a court should apply the alter ego doctrine in a particular case is based on a number of factors; there is no litmus test for determining when the alter ego doctrine should be applied; and "[t]he essence of the alter ego doctrine is that justice be done." (*Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at pp. 300-301; *Greenspan*, *supra*, 191 Cal.App.4th at pp. 510-513.)  Still, the equities of applying the alter ego doctrine should not be conflated with the separate question of whether the defendant has demonstrated prejudice resulting from the plaintiff's delay in asserting the alter ego claim.

In our view, a court errs if it refuses to apply the alter ego doctrine based solely on a plaintiff's unreasonable delay, or lack of due diligence, in asserting the alter ego claim, as occurred in *Alexander*.  Barring an alter ego claim based solely on the plaintiff's unreasonable delay in asserting the claim allows the alleged alter ego defendant to avail itself of the defense of laches without showing it was prejudiced by the delay.  This is contrary to the settled requirements of laches (*Miller*, *supra*, 27 Cal.3d at p. 624) and "would, in effect, revive the discredited doctrine of 'stale claims'" which our state high

---

*[footnote continued from previous page]*
debtor must be made with due diligence, or within a reasonable time.  (*Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at p. 309 (dis. opn. of Lucas, J.) [citing *Alexander* for the proposition that amending a judgment to add an additional judgment debtor "is not permitted in the absence of a showing of due diligence on the part of the plaintiff"]; *Levander v. Prober* (9th Cir. 1999) 180 F.3d 1114, 1121, fn. 10 [citing *Alexander* for the proposition that a motion to amend a judgment must be "made within a reasonable time"].)

court long ago repudiated (*Conti v. Board of Civil Service Commissioners*, *supra*, 1 Cal.3d at pp. 359-360; *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 735-736 (*Maquire*).)  In *Maquire*, the court observed that, in both legal and equitable actions, the "mere lapse of time, other than that prescribed by statutes of limitation, does not bar relief." (*Maquire*, *supra*, at p. 736.)  Since *Maguire*, the court has "consistently rejected the concept that lapse of time less than the period of limitations in itself constitutes a defense." (*Conti*, *supra*, at pp. 359-360; *Miller*, *supra*, at p. 624.)[5]

---

[5]  *Alexander* also relied on section 129 of the Restatement of Judgments (1942) and selected "comments" on section 129. (*Alexander*, *supra*, 104 Cal.App.3d at p. 48.) Section 129 states:  "Equitable relief from a judgment may be refused to a party thereto if [¶]  (a) before or after the judgment was rendered the complainant or a person representing him failed to use care to protect his interests, or  [¶]  (b) after ascertaining the facts the complainant failed promptly to seek redress." (Rest., Judgments, § 129.) One comment on clause (b), quoted in *Alexander,* explains when a party's delay in seeking redress will be deemed unreasonable:  "'In determining whether the delay by the complainant in seeking relief has been unreasonable, many circumstances are to be considered.  Although length of time in itself, *aside from its likelihood of producing hardship*, is not a bar, nevertheless the length of time which has elapsed from the time when the complainant knew or should have known of the facts . . . is an important element where no reason is suggested for the delay.'" (*Alexander*, *supra*, at p. 48, italics added, quoting Rest., Judgments, § 129, com. on cl. (b).)

Another comment on clause (b), not observed in *Alexander*, explains when a party's unreasonable delay in seeking relief from a judgment, or delay in seeking to amend a judgment, is likely to produce a hardship or prejudice.  It states:  "*Laches. Elements to be considered.*  A bill for equitable relief is not barred merely by lapse of time; relief is denied only if it would be unjust to allow it to be granted.  The existence of such injustice depends on an affirmative answer to two questions:  Has the party seeking relief been unreasonable in his delay after learning the facts; [*and*] *has the delay made it unfair to permit the action either because a hardship would result to the respondent or to third persons because of a change of circumstances or because there would be a substantial chance of reaching an erroneous decision as to the facts*?" (Rest., Judgments, § 129, com. on cl. (b), second italics added.)  This comment comports with settled case law that laches does not apply based solely on an unreasonable delay, but prejudice from the delay must be affirmatively shown. (*Miller*, *supra*, 27 Cal.3d at p. 624.)

In addition to absolving the defendant of proving the prejudice element of laches, the denial of a motion to amend a judgment to add an alter ego defendant based solely on the moving party's unreasonable delay in filing the motion, allows the court to create, by judicial fiat, a de facto limitations period on a section 187 motion to amend a judgment, even though no limitations period applies to the motion. (*Fahmy v. Medical Bd. of California* (1995) 38 Cal.App.4th 810, 814-816 [trial court's determination that medical board's three-year delay in taking disciplinary action against physician was unreasonable as a matter of law "[flew] in the face of the Legislature's informed refusal to impose a statute of limitations on physician disciplinary proceedings"].) As explained in *Fahmy*, statutes of limitations may not be created "'by judicial fiat'"; they "'are products of legislative authority and control.' [Citation.] By focusing solely on the passage of time, and not on the issue of disadvantage and prejudice, a court risks imposing a de facto— and impermissible—statute of limitations in a situation where the Legislature chose not to create a limitation on actions." (*Id.* at p. 816.)

No statute of limitations applies to a section 187 motion to amend a judgment to add a judgment debtor. To the contrary, the motion may be made "'"""at any time so that the judgment will properly designate the real defendants."""' [Citation.]" (*Wells Fargo*, *supra*, 227 Cal.App.4th at p. 7.) "Simply put, section 187 recognizes 'the inherent authority of a court to make its records speak the truth.' [Citation.]" (*Greenspan*, *supra*, 191 Cal.App.4th at p. 509, quoting *Mirabito v. San Francisco Dairy Co.* (1935) 8 Cal.App.2d 54, 57.) It is apparent that the Legislature, in determining not to subject a

section 187 motion to amend a judgment to any limitations period, does not wish to hamper courts in exercising their authority to carry their jurisdiction into effect by ensuring their judgments are enforced against the "real defendants." (See *Fahmy v. Medical Bd. of California*, *supra*, 38 Cal.App.4th at p. 816.)

In denying plaintiffs' motion to amend, the court posed an analogy based on an action for breach of a written contract: the court explained that if SCCA had breached a written contract to pay plaintiffs their attorney fees on October 23, 2008, the date of the latest attorney fee award, a lawsuit filed more than four years later, on October 26, 2012, the date the motion to amend was filed, would have been time-barred. (§ 337 [four-year limitations period applies to action on written contract].) This analogy was inapt, because SCCA was not a party to these CEQA actions when plaintiffs obtained their attorney fees and costs awards in October 2008, and SCCA did not have a contractual obligation to pay the awards. Thus, the four-year limitations period on an action for breach of a written contract (§ 337) did not apply to plaintiffs' motion to amend the judgments. (Cf. *United States Capital Corp. v. Nickelberry* (1981) 120 Cal.App.3d 864, 867 ["An action based on a judgment is an action based on contract. The judgment becomes a debt which *the judgment debtor* is obligated to pay and the law implies a contract on his part to pay it." (Italics added.)].)

C. *Laches May be Asserted as a Defense to a Section 187 Motion*

Plaintiffs alternatively claim that the equitable defense of laches may not be raised in opposition to a section 187 motion to amend a judgment. They argue that a section

187 motion to amend a judgment is an *action on a judgment* (§ 683.050); an action on a judgment is an action at law; and laches may not be asserted as a defense to an action at law. We disagree with the premise of this argument. A section 187 motion to amend a judgment is *not* an action at law; it is an """""equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant. . . ."""" (*Greenspan, supra,* 191 Cal.App.4th at p. 508.) Thus, laches may be asserted as a defense to a section 187 motion to amend a judgment to add a judgment debtor.

Generally speaking, a money judgment is enforceable under the Enforcement of Judgments Law (§ 680.010 et seq.) (the EJL) for 10 years following the date of entry of the judgment (§ 683.020). The judgment may be renewed, and its 10-year enforceability period extended, by filing an application for renewal within 10 years after the date the judgment was entered, or most recently renewed. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2008) 168 Cal.App.4th 185, 191, 195 (*OCM*); *Pratali*, *supra*, 4 Cal.App.4th at pp. 636-637; §§ 683.110-683.140.)

Alternatively, the judgment may be renewed by bringing an independent action on the judgment within the 10-year limitations period of section 337.5. (§ 683.050; *Pratali*, *supra*, 4 Cal.App.4th at pp. 636-638; *OCM*, *supra*, 168 Cal.App.4th at pp. 193-195.)[6] An

---

[6] The 10-year period for renewing a judgment, and the 10-year period for filing an independent action on a judgment, are not coterminous: "[T]he period applicable to renewals begins when judgment is entered, and may not be tolled, whereas the period applicable to actions on a judgment begins when the judgment is final, and is subject to tolling." (*OCM*, *supra*, 168 Cal.App.4th at p. 195, fn. 7.)

action on a judgment is an action at law, and the defense of laches may not be raised in actions at law, including an action on a judgment. (*United States Capital Corp. v. Nickelberry*, *supra*, 120 Cal.App.3d at pp. 867-868; *Pratali*, *supra*, at pp. 644-645; *People v. Koontz* (2002) 27 Cal.4th 1041, 1088 [laches may be asserted only in a suit in equity].) As an alternative to filing a section 187 motion to add a judgment debtor to a judgment, the judgment creditor may file an independent action on the judgment, alleging that the proposed judgment debtor was an alter ego of an original judgment debtor. (See *Wells Fargo*, *supra*, 227 Cal.App.4th at p. 7; *Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072, fn. 1; Rest. 2d Judgments, § 18(1); Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2015), ¶ 6.1575, p. 6G-87.)

Here, however, plaintiffs did not file an independent action on the judgments; they filed a section 187 motion to amend the judgments. Thus, it is unnecessary to determine whether laches may be asserted as a defense to *an independent action on a judgment* to add a judgment debtor to a judgment as an alter ego of an original judgment debtor. (Cf. *Pratali*, *supra*, 4 Cal.App.4th at p. 645 [laches unavailable as defense to action on judgment to renew the judgment *against the original judgment debtor*].)

Plaintiffs cite no authority, and we have found none, to support the proposition that a section 187 motion to amend a judgment is an "action at law," and that laches may not be raised in opposition to a section 187 motion. The better rule, we believe, is to treat section 187 motions, as courts have long treated them, as equitable proceedings which may be brought """"*at any time* so that the judgment will properly designate the real

defendants.'"'" (*Wells Fargo*, *supra*, 227 Cal.App.4th at p. 7, italics added; *Greenspan*, *supra*, 191 Cal.App.4th at p. 508; *Mirabito v. San Francisco Dairy Co.*, *supra*, 8 Cal.App.2d at p. 57 ["That a court may at any time amend its judgment so that the latter will properly designate the real defendant is not open to question."].)

Because a section 187 motion to amend a judgment to add a judgment debtor is an equitable procedure, and is not subject to a fixed limitations period, we discern no reason why laches may not be raised as defense to the motion. As the United States Supreme Court recently observed: "[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation. [Citation.]" (*Petrella v. Metro-Goldwyn-Mayer, Inc.* (2014) ___ U.S. ___, ___ [134 S.Ct. 1962, 1973].)

D. *Remand for Further Proceedings*

In denying plaintiffs' motion to amend, the trial court observed that the equities favored granting the motion, and the court "likely" would have granted the motion if plaintiffs had filed it earlier. The matter must now be remanded to the trial court to determine whether plaintiffs proved the their alter ego claim against SCCA. Specifically, the court must determine whether plaintiffs met their burden of demonstrating, by a preponderance of the evidence, that (1) SCCA effectively controlled the CEQA litigation with plaintiffs and was virtually represented in the litigation, (2) there was such a unity of interest and ownership in SCCA and SCC/BB that separate personalities of the two entities did not exist, and (3) an inequitable result will follow unless SCCA is held liable

for paying plaintiffs' attorney fees and costs awards.  (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership*, *supra*, 222 Cal.App.4th at pp. 815-816.)

## IV.  DISPOSITION

The January 27, 2014, order denying plaintiffs' motion to amend the April 2008 judgments to add SCCA as an additional judgment debtor is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.  The parties shall bear their respective costs on appeal.  (Cal. Rules of Court, rule 8.278.)

CERTIFIED FOR PUBLICATION

KING
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.