Filed 4/16/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WARREN M. LENT et al., | B292091 |
| Plaintiffs, Appellants, and Cross-respondents, | (Los Angeles County Super. Ct. No. BS167531) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN APPELLATE JUDGMENT] |
| CALIFORNIA COASTAL COMMISSION, | |
| Defendant, Respondent, and Cross-appellant, | |
| CALIFORNIA STATE COASTAL CONSERVANCY et al., | |
| Real Parties in Interest. | |

THE COURT:

The opinion filed on April 5, 2021 and certified for publication, is modified as follows:

1.    On page 43, in the second sentence of the last paragraph, add the phrase "in their as-applied challenge" after the word "contend," so that the sentence reads:

They do not contend in their as-applied challenge, for example, that they needed to cross-examine or otherwise question a particular witness the Commission relied on or that they needed to subpoena a particular witness who was unwilling to testify.

2.    In footnote 8 on pages 30 to 31, replace the second sentence in the footnote, which begins with the word "Because," with:

But the trial court did not remand based on either purported finding, instead determining the Lents did "not challenge the Commission's calculation of the fine" in their petition.  Therefore, we do not address the parties' arguments on these issues.

Appellant's petition for rehearing is denied.

This order does not change the appellate judgment.

PERLUSS, P. J.              SEGAL, J.              FEUER, J.

2

Filed 4/5/21 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WARREN M. LENT et al.,<br><br>    Plaintiffs, Appellants, and<br>    Cross-respondents,<br><br>    v.<br><br>CALIFORNIA COASTAL<br>COMMISSION,<br><br>    Defendant, Respondent, and<br>    Cross-appellant,<br><br>CALIFORNIA STATE COASTAL<br>CONSERVANCY et al.,<br><br>    Real Parties in Interest. | B292091<br><br>(Los Angeles County<br>Super. Ct. No. BS167531) |

        APPEAL from a judgment of the Superior Court of Los Angeles County.  James C. Chalfant, Judge.  Reversed with directions.

        Pacific Legal Foundation, Damien M. Schiff, Joshua P. Thompson, and Jeremy Talcott; FisherBroyles and Paul J. Beard II for Plaintiffs, Appellants, and Cross-respondents.

Law Offices of Thomas D. Roth and Thomas D. Roth for Center for Balanced Land Use, Inc. as Amicus Curiae on behalf of Plaintiffs, Appellants, and Cross-respondents.

Knipe Law Firm and V. Nicholas Knipe for Malibu Association of Realtors as Amicus Curiae on behalf of Plaintiffs, Appellants, and Cross-respondents.

Berding Weil and Fredrick A. Hagen; Kara M. Rollins and Harriet H. Hageman for New Civil Liberties Alliance as Amicus Curiae on behalf of Plaintiffs, Appellants, and Cross-respondents.

Kara M. Rollins and Harriet H. Hageman for National Federation of Independent Business Small Business Legal Center as Amicus Curiae on behalf of Plaintiffs, Appellants, and Cross-respondents.

Chris Scheuring for California Farm Bureau Federation as Amicus Curiae on behalf of Plaintiffs, Appellants, and Cross-respondents.

Xavier Becerra, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Christina Bull Arndt and David Edsall Jr., Deputy Attorneys General, for Defendant, Respondent, and Cross-appellant.

Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Deborah A. Sivas, and Molly L. Melius for Surfrider Foundation and Azul as Amici Curiae on behalf of Defendant, Respondent, and Cross-appellant.

———————————————

# INTRODUCTION

A house sits on beachfront property in Malibu. A five-foot-wide vertical easement, owned by the California Coastal Conservancy for public access to the coast, encumbers one side of the property. By 1983 the property owner had built on the easement area a deck providing private access to the beach, a staircase from the deck leading to the house, and a gate blocking public access to the easement area. The California Coastal Commission, which enforces the California Coastal Act (Pub. Resources Code, § 30000 et seq.)[1] and remedies violations of permit conditions, did not approve these structures.

Warren and Henny Lent purchased the property in 2002. In 2007 the Commission began asking the Lents to remove the structures so the Conservancy could build a public accessway over the easement area. The Lents refused. In 2014 the Commission served the Lents with a notice of intent to issue a cease and desist order. The notice advised the Lents the Commission could impose administrative penalties under section 30821, a statute enacted that year authorizing the Commission to impose penalties on property owners who violate the public access provisions of the Coastal Act. Still, the Lents refused to remove the structures.

Two weeks before the scheduled hearing on the cease and desist order, the Commission staff issued a report detailing the Lents' alleged violations of the Coastal Act. In the report the Commission staff recommended that the Commission impose a penalty of between $800,000 and $1,500,000 (and specifically

---

[1]     Undesignated statutory references are to the Public Resources Code.

recommended a penalty of $950,000), but stated that the Commission was justified under the circumstances in imposing a penalty of up to $8,370,000. At the hearing the Commission issued the cease and desist order and imposed a penalty of $4,185,000.

The Lents filed a petition for writ of mandate asking the trial court to set aside the Commission's order and penalty. In addition to contending substantial evidence did not support the Commission's determination that the Lents violated the Coastal Act, the Lents argued section 30821 is unconstitutional on its face because it allows the Commission to impose substantial penalties at an informal hearing where the alleged violator does not have the procedural protections traditionally afforded defendants in criminal proceedings. The Lents also argued that section 30821 is unconstitutional as applied to them and that the penalty violated the constitutional prohibition on excessive fines. The trial court granted the petition in part and denied it in part, ruling substantial evidence supported the Commission's decision to issue the cease and desist order and to impose a penalty. The court ruled, however, the Commission violated the Lents' due process rights by not giving them adequate notice of the amount of the penalty the Commission intended to impose. Therefore, the court set aside the penalty and directed the Commission to allow the Lents to submit additional evidence. Both the Lents and the Commission appealed.

We conclude substantial evidence supported the Commission's decision to issue the cease and desist order. We also conclude the Commission did not violate the Lents' due process rights by imposing a $4,185,000 penalty, even though its staff recommended a smaller penalty, because the Commission

4

had previously advised the Lents it could impose a penalty of up to $11,250 per day and the Commission staff specifically advised the Lents that the Commission could impose a penalty of up to $8,370,000. Therefore, we reverse the trial court's judgment remanding the matter to the Commission.

On the Lents' appeal of the penalty, we conclude the Lents failed to show section 30821 is unconstitutional, either on its face or as applied to them. We also conclude the penalty does not violate the constitutional prohibition on excessive fines. Therefore, we reverse the superior court's judgment and affirm the Commission's order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *A Prior Owner Builds the House*

The Lents own property in Malibu. South of the property is the ocean; north of the property is the Pacific Coast Highway. In 1978 a prior owner of the property applied to the Commission for a coastal development permit to build a house. As a condition of approving the permit, the Commission required the prior owner to dedicate a vertical public-access easement on the eastern side of the property. In 1980 the prior owner recorded an offer to dedicate a five-foot-wide easement, and in 1982 the Conservancy recorded a certificate of acceptance. A storm drainpipe, owned by the County of Los Angeles, runs across the easement area.

Notwithstanding the permit condition and the easement, the prior owner built in the easement area a wooden deck that sits above the drainpipe and a staircase that provides access from the deck to the house. The staircase occupies 27 inches of the five-foot-wide easement. The deck provides access to the sand

5

through a (different) staircase. The owner also constructed a fence and gate adjacent to the sidewalk that blocks access to the easement area from the highway. The Commission did not issue a permit or otherwise approve any of these structures. This is a view of the easement area from the north (i.e., PCH):



6

B. *The Commission Attempts To Obtain the Lents'*
*Consent To Remove the Unpermitted Structures*

In 1993 the Conservancy sent a letter to the owners of the property informing them of the easement and stating the Conservancy had "the right to open for public use a five-foot-wide corridor for pedestrian access to and from the shoreline." The Conservancy also stated, however, the easement would "remain closed until the Conservancy locate[d] a management agency and open[ed] this easement to public use." Observing that the gate blocked access to the easement area, the Commission asked the owners to "either remove the gate" or "seek the Conservancy's permission to keep the gate in place during the period that the accessway is officially closed" and remove the gate once the Conservancy decided to open the easement.

The Lents purchased the property in 2002 (with the gate intact). In April 2007 the Commission sent a letter to the Lents stating the structures in the easement area, including the deck and the gate, were inconsistent with the easement and violated the Coastal Act and asking the Lents to remove all structures in the easement area. The Commission also attached a copy of the house's original permit conditions. The next month the Commission served the Lents with a "notice of intent to commence cease and desist order proceedings." The Lents did not agree to remove the structures.

Because the topography of the easement area includes several steep elevation drops, the Conservancy determined it had to build an accessway with stairs to make the easement usable for the public. In 2008 the Conservancy hired a contractor to conduct a survey of the easement area to assess the feasibility of building an accessway, and in 2010 an architectural firm

completed conceptual plans for the accessway.  Later that year, representatives from the Commission, the Conservancy, and the architectural firm met at the property with the Lents and their attorneys to discuss development of the accessway.

During the next several years the Commission and the Lents' attorneys exchanged correspondence in which the Commission asked the Lents to remove the structures in the easement area and the Lents objected for various reasons. Having failed to resolve the issue, the Commission sent a letter to counsel for the Lents in June 2014 stating that, "under the newly enacted Section 30821, . . . in cases involving violations of the public access provisions of the Coastal Act, the Commission is authorized to impose administrative civil penalties in an amount up to $11,250 per day per violation."

C.    *The Commission Issues a Cease and Desist Order and Imposes a Monetary Penalty*

In September 2015 the Commission served the Lents with a new notice of intent to issue a cease and desist order and to impose penalties under section 30821.  In February 2016 the Lents served the Commission with a statement of defense. Among other arguments, the Lents contended the Commission had approved the structures in the easement area, the doctrine of laches barred the Commission from requiring the Lents to remove the stairway, and the Commission could not impose penalties on the Lents because the Lents had not built the allegedly unpermitted structures.

On November 18, 2016, two weeks before the scheduled hearing on the cease and desist order, the Commission staff submitted a report with proposed findings and recommendations.

8

The report stated that under section 30821 "[t]he potential penalty that the Commission could impose" was $8,370,000—$11,250 per day for 744 days, beginning November 24, 2014, the date the Commission advised the Lents that their violations of the Coastal Act could expose them to administrative penalties. The staff report stated that a penalty of up to $8,370,000 was warranted because the violations caused "significant blockage of public access" to the coast, there was limited coastal access in the area, the Lents refused to undertake any "voluntary restoration efforts" despite the Commission's efforts over many years to obtain the Lents' consent, and the Lents used the property as a vacation rental and marketed the property's private beach access on at least one vacation rental website. The Commission staff, however, "taking the most conservative possible approach in weighing the relevant statutory factors," recommended the Commission impose a penalty between $800,000 and $1,500,000, and specifically $950,000.

At the public hearing the Commission staff presented its findings and conclusions, again recommending the Commission impose a $950,000 penalty. Counsel for the Lents presented a defense, and Warren Lent spoke at the hearing. After the Lents' presentation, several individuals spoke, including the executive officer of the Conservancy. The executive officer stated that the only impediment to opening the easement for public access was the Lents' refusal to remove the structures, and both the executive officer and another member of the Conservancy stated that the Conservancy's engineers had determined it was feasible to build an accessway in the easement area.

After the presentations, the commissioners deliberated. Several commissioners stated the Lents' conduct was

particularly egregious and warranted a penalty higher than the staff's recommendation. Ultimately, the Commission voted unanimously to issue the cease and desist order requiring the Lents to remove the structures in the easement area and to impose a penalty of $4,185,000.

D. *The Lents File a Petition for Writ of Mandate, Which the Trial Court Grants in Part*

In February 2017 the Lents filed a petition for a writ of mandate. In addition to making the arguments they made during the administrative proceedings, the Lents argued section 30821 is unconstitutional on its face because it allows the Commission to impose substantial penalties without providing property owners sufficient procedural protections. The Lents also argued the penalty was an excessive fine under the federal and state constitutions.

The trial court found that there was "overwhelming evidence" the Lents violated the Coastal Act by "interfering with the public's right of access to the ocean via the easement" and that the "Conservancy has made clear that the stairway/gate has substantially impaired its ability to move forward with a public accessway." The court ruled that substantial evidence supported the Commission's cease and desist order, that laches did not bar the Commission from issuing the order, and that the Commission was authorized to impose penalties. Although the court ruled the penalty was not constitutionally excessive, the court also ruled the Commission violated the Lents' due process rights by "deviat[ing] upward from the staff-recommended $950,000" penalty without providing the Lents an "opportunity to argue against the Commission's . . . reasoning for imposition of a

10

considerably larger fine." The court stated: "The amount of the fine in this case is substantial and the hearing procedure did not give [the Lents] an opportunity to present all available evidence and argue against the $4.1 million penalty imposed. An additional opportunity to present evidence would have enhanced the reliability of the quasi-criminal proceeding and the fine actually imposed, and a safeguard permitting [the Lents] to present additional penalty evidence would not adversely impact the Commission's procedure."

The trial court entered judgment ordering the Commission to set aside the penalty, inform the Lents of a specific proposed penalty, and give the Lents an opportunity to present additional evidence. The trial court otherwise denied the Lents' petition. The Lents timely appealed, and the Commission timely cross-appealed.

## DISCUSSION

A.   *The Commission Did Not Abuse Its Discretion in Issuing the Cease and Desist Order*

1.   *Standard of Review*

Under the Coastal Act "[a]ny aggrieved person" has the "right to judicial review of any decision or action of the commission by filing a petition for writ of mandate in accordance with [Code of Civil Procedure] Section 1094.5 . . . ." (§ 30801; see *SLPR, L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 321 ["'administrative mandamus is the "proper and sole remedy" for challenging or seeking review of' a [Commission] decision"].) "[T]he trial court reviews the

11

commission's decision to determine whether the commission 'proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'" (*Mountainlands Conservancy, LLC v. California Coastal Com.* (2020) 47 Cal.App.5th 214, 230; see Code Civ. Proc., § 1094.5, subd. (b); *San Diego Navy Broadway Complex Coalition v. California Coastal Com.* (2019) 40 Cal.App.5th 563, 572.) "'Our scope of review is identical to that of the trial court. [Citations.] We, like the trial court, examine all relevant materials in the entire administrative record to determine whether the agency's decision is supported by substantial evidence.'" (*San Diego Navy*, at p. 572; see *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 922.)

> 2. *The Commission Proceeded in the Manner Required by Law in Issuing the Cease and Desist Order*

Section 30600 requires "any person . . . wishing to perform or undertake any development in the coastal zone" to "obtain a coastal development permit." Under section 30810 the Commission may issue a cease and desist order after a public hearing if the Commission "determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit or (2) is inconsistent with any permit previously issued by the commission . . . ." The Lents argue an owner who merely purchases property containing

12

unpermitted structures, but who did not build the structures, does not undertake activity that requires a permit under the Coastal Act. Therefore, according to the Lents, regardless of whether the structures in the easement area required a permit or violated the terms of the easement, the Commission erred in issuing the cease and desist order.

The law does not support the Lents' interpretation of section 30600. Although the statute refers to the person "wishing to perform or undertake" development, the requirement to obtain a permit for any development in the Coastal Zone necessarily extends to subsequent owners of the property. "It is well settled that the burdens of permits run with the land once the benefits have been accepted." (*Ojavan Investors, Inc. v. California Coastal Com.* (1994) 26 Cal.App.4th 516, 526.) A successor obtains property "with the same limitations and restrictions which bound" the prior owner. (*Id.* at p. 527; see, e.g., *City of Berkeley v. 1080 Delaware, LLC* (2015) 234 Cal.App.4th 1144, 1151 [purchaser of property waives, "by [its] purchase of deed-restricted lots, any right to a property interest greater than that conveyed by [the] predecessors in interest," and the "conditions of the permit remain enforceable against a subsequent owner of the property"]; *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1379 ["once the period to challenge the [coastal development permit] restrictions had expired and they were recorded, they became immune from collateral attack by the original property owner *and successor owners*"]; *Serra Canyon Co. v. California Coastal Com.* (2004) 120 Cal.App.4th 663, 668 [although the property owner "was not a party to the original permits, it was bound by the inaction of its predecessor in interest"]; *Ojavan*, at p. 525 [deadline for successors to challenge

13

coastal development permits ran from the date the Commission issued the permits, not the date the successors purportedly violated the permit restrictions, because the successors were "bound by what their grantee had to convey"].)  Therefore, an owner who maintains a development on his or her property "undertakes activity" that requires a permit for purposes of section 30810, as does an owner who maintains a development inconsistent with a previously issued permit, regardless of whether he or she constructed the development.  (See *Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 386 (*Ojavan II*) [former provision of the Coastal Act, which provided that "[a]ny person who violates any provision of this division shall be subject to a civil fine of not to exceed ten thousand dollars," applied to coastal permit violations and "extended to . . . the successors-in-interest in the real property subject to the permits"].)

Under the Lents' theory, a property owner who develops coastal property has an obligation to obtain permits under section 30600, but a subsequent purchaser does not.  Developers could avoid complying with the Coastal Act by simply selling the property before the Commission discovers the development, a result inconsistent with the purposes and directives of the Coastal Act.  (See § 30001, subd. (d) ["[t]he Legislature hereby finds and declares" that "future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state"]; § 30607 ["[a]ny permit that is issued or any development or action approved . . . shall be subject to reasonable terms and conditions in order to ensure that such development or action will be in accordance with the provisions of [the Act]"]; see

14

also § 30009 [the Coastal Act "shall be liberally construed to accomplish its purposes and objectives"].)

The court in *Leslie Salt Co. v. San Francisco Bay Conservation & Development Com.* (1984) 153 Cal.App.3d 605 reached a similar conclusion for nearly identical statutory language. *Leslie Salt* involved a challenge to the McAteer-Petris Act (Gov. Code, § 66600 et seq.), which authorizes the San Francisco Bay Conservation and Development Commission (SFBCDC) to issue permits to any person or government agency seeking to place fill in the San Francisco Bay. (See *id.*, §§ 66604, 66610, 66632.) The McAteer-Petris Act has a provision nearly identical to the cease and desist provision of the Coastal Act: The SFBCDC may issue a cease and desist order if it "determines that a person or governmental agency has undertaken, or is threatening to undertake, an activity that (1) requires a permit from the commission without securing a permit, or (2) is inconsistent with a permit previously issued by the commission . . . ." (*Id.*, § 66638, subd. (a).) In *Leslie Salt* the SFBCDC issued a cease and desist order requiring a property owner to remove fill that had been placed on the owner's property, even though the SFBCDC did not prove the current owner placed or authorized the placement of the fill. (*Leslie Salt Co.,* at pp. 609-610.) The court in *Leslie Salt* reversed the trial court's order issuing a writ of mandate to set aside the order, holding it was reasonable and necessary to construe the cease and desist provision so that its reference to "one who 'has undertaken, or is threatening to undertake' the proscribed activities refers not simply to one responsible for the actual placement of unauthorized fill but also to one whose property is misused by others for that purpose . . . ." (*Id.* at pp. 618, 622.)

15

The Lents attempt to distinguish *Leslie Salt* on the ground that, unlike the McAteer-Petris Act, the Coastal Act gives the Commission an additional mechanism to remedy unlawful activity. Under section 30811 the commission may "order restoration of a site if it finds that the development has occurred without a coastal development permit . . . , the development is inconsistent with [the Coastal Act], and the development is causing continuing resource damage." According to the Lents, the Commission may issue a restoration order against a property owner who did not build an unpermitted development, but not a cease and desist order. Section 30811, however, does not say this. Section 30811 does not specify against whom the Commission may issue a restoration order, nor does it distinguish between developers and "mere" property owners. Contrary to the Lents' assertion, nothing in the statutory scheme suggests that section 30810 applies only to persons who build an unpermitted development and that section 30811 applies more broadly to persons who build the development and to subsequent property owners.

Moreover, although the Commission characterized its order requiring the Lents to remove the structures in the easement area as a cease and desist order, the Commission's findings satisfied the requirements for issuing a restoration order under section 30811.[2] The Commission determined that the Lents' property contained unpermitted developments (an issue we will address), that the developments were inconsistent with the easement and violated the public access provisions of the Coastal

---

[2] The Commission's 2007 notice to the Lents stated the Commission intended to issue both a cease and desist order under section 30810 and a restoration order under section 30811.

16

Act, and that "the presence of the unpermitted development in a public easement is causing continuing resource damage" by obstructing public access to the coast. The Lents concede that, under the regulations implementing section 30811, public access qualifies as a resource and that a Commission restoration order may require an owner to remove an unpermitted development. (See Cal. Code Regs., tit. 14, § 13190, subd. (a) ["as such term is used in section 30811 . . . '[r]esource' means any resource which is afforded protection under the policies of Chapter 3 of the Coastal Act, including but not limited to public access"].)

### 3. *Substantial Evidence Supported the Commission's Cease and Desist Order*

In its cease and desist order, the Commission concluded that the Lents, by retaining "solid material and structures" on the property, including "the separate placement of a gate, a staircase, decks, and supporting structures," undertook activity that required a permit and that was inconsistent with a previously issued permit. The Lents contend there was no substantial evidence to support the Commission's decision. There was.[3]

As stated, with certain exceptions not applicable here, any person who wants to perform or undertake development in the coastal zone must obtain a coastal development permit.

---

[3] Although the Lents apparently removed the unpermitted structures after the trial court entered judgment, they state they plan to rebuild them if they are successful in this litigation.

17

(§ 30600.)[4]  "'[T]he Coastal Act's definition of "development" goes beyond "what is commonly regarded as a development of real property."'" (*Surfrider Foundation v. Martins Beach 1, LLC* (2017) 14 Cal.App.5th 238, 252; see *11 Lagunita, LLC v. California Coastal Com.* (2020) 58 Cal.App.5th 904, 919 ["The word 'development' as used in the Coastal Act is expansive."].) Not only does "development" include "the placement or erection of any solid material or structure" on land and "construction . . . or alteration of the size of any structure," it includes any "change in . . . access" to water.  (§ 30106.)  As the Commission found, the deck, staircase, and gate were developments that required a coastal development permit because they were solid materials or structures built on land.  (See *LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770, 805 ["gates and signs are 'development' within the meaning" of section 30106].)  The deck, stairway, and gate were also developments because they altered access to water—namely, by providing beach access to the occupants of the Lents' property and restricting beach access to all others.  (See *Surfrider Foundation*, at p. 247 [landowners engaged in unpermitted development under section 30106 by closing a gate on a road to the beach, putting up a sign stating the beach was closed, covering a sign that advertised public access, and stationing security guards to deny public access]; see also *San Diego Unified Port Dist. v. California Coastal Com.*, *supra*, 27 Cal.App.5th at p. 1129 ["a core principle of the [Coastal] Act is to maximize public access to and along the coast as well as recreational opportunities in the coastal zone"].)

---

[4]    Exceptions include, for example, "[i]mmediate emergency work necessary to protect life or property."  (§ 30600, subd. (e)(1).) The Lents do not contend an exception applies.

Substantial evidence supported the Commission's finding the structures were not permitted. The plans the prior owner submitted in support of the original permit application do not depict any structures in the easement area (except the drainpipe). On the other hand, the plans do depict a deck on the south side of the house facing the beach and an exterior stairwell on the western side of the house—the side that does not include the easement area—providing access from the house to the beach. In 1980 the owner of the property also applied for, and the Commission approved, an amended permit to extend the size of the house toward the coast. Again, the prior owner submitted plans in support of the amendment that did not depict structures in the easement area, but that did depict the deck on the south side of the house. The plans also depicted a proposed new staircase leading from the deck to the beach (which the Commission did not approve).

Substantial evidence also supported the Commission's finding the structures in the easement were inconsistent with both the original permit and the amended permit. The original permit included a condition requiring all construction to "occur in accord with the proposal as set forth in the application," with "[a]ny deviations from the approved plans" requiring review by the Commission. The amended permit included the same condition, plus an additional condition requiring "[c]onstruction of the house and deck" to "occur in accord with the revised plans submitted by the applicant." It also provided that "[a]ll conditions of the original permit not expressly altered by this amendment shall remain in effect." The structures in the easement area were inconsistent with these conditions.

19

Notwithstanding this evidence, the Lents rely on two sets of conceptual floorplans to argue the Commission impliedly approved the deck and staircase in the easement area. The Lents contend the first set, which the prior owners submitted to the County of Los Angeles in 1980, depicts both the staircase in the easement area and an exterior door on the east side of the house adjacent to the stairway. However, the Commission stated that this set of plans, while it may have been submitted to the county, was not in the Commission's permit file for the property, and it is a reasonable inference (if not a self-evident certainty) the Commission would not have approved a stairway that encroached two feet three inches into a five-foot-wide easement—nearly half the width of the easement. And even if the Commission had approved these plans, the plans are largely illegible, and the Lents provided no evidence the staircase and deck, as constructed, comply with these plans.

The second set of plans, which the prior owner did submit to the Commission, shows an exterior door on the northeast corner of the building adjacent to the easement area. According to the Lents, the existence of the door in the conceptual plan implies the Commission approved the stairway and deck. However, the plans do not depict the stairway or the deck in the easement area. Moreover, the prior owner submitted the plans in support of a 1981 amendment to the permit that had nothing to do with the purported exterior door. This third amendment "permit[ted] the applicant to extend the western corner of the . . . house"—a corner not adjacent to the easement area—an additional "18 inches beyond the stringline" between the corners of the adjacent buildings and stated that "[a]ll conditions of the

20

original permit not expressly altered by this amendment shall remain in effect."

Finally, the Lents submitted the virtually identical declarations of two architects, both of whom stated that in the 1970s and 1980s they did not always depict "walkways, steps, planters and other landscape/ancillary features outside of the footprint of the residence" on initial concept drawings submitted to the Commission. This testimony, however, was not consistent with either the original plans or the plans submitted in support of the 1980 amendment, each of which depicted a deck and stairway—just not the ones eventually built in the easement area. The Commission did not have to find the architects' declaration(s) credible or persuasive. (See *Ross v. California Coastal Com.*, *supra*, 199 Cal.App.4th at p. 922 ["'it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it"].) And even if the Commission occasionally permitted stairways and decks that were not depicted on conceptual plans, such action would have little bearing on whether the Commission approved the stairway and deck here. The owners constructed the stairway and deck in a public-access easement area, and the architects did not state they generally omitted depictions of stairways and decks in public-access easement areas. In light of the numerous conceptual plans submitted to the Commission that did not depict these structures (but depicted similar structures elsewhere on the property), the permit condition requiring the owner to dedicate an easement for public access, and the fact the structures

21

encroached on the easement, there was substantial evidence the Commission never issued permits for the structures.

B.    *Laches Did Not Bar the Commission from Issuing the Cease and Desist Order*

The Lents argue laches barred the Commission's enforcement action because "the Commission was guilty of unreasonable delay in seeking the [s]tructures' removal, thereby unduly prejudicing the Lents and acquiescing as a matter of law in their maintenance." The trial court did not err in ruling the Lents had not met their burden of showing laches barred the Commission from issuing the order.

"Under appropriate circumstances, the defense of laches may operate as a bar to a claim by a public administrative agency . . . if the requirements of unreasonable delay and resulting prejudice are met." (*Robert F. Kennedy Medical Center v. Belshe* (1996) 13 Cal.4th 748, 760, fn. 9; accord, *Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 568; *Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 985-986.)[5] The standard of review for an order applying the doctrine of laches is generally substantial evidence. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67.) But because laches is an affirmative defense, on which the defendant has the burden of proof (*Highland Springs Conference & Training Center v. City of Banning* (2016)

---

[5]    Laches, however, ""is not available where it would nullify an important policy adopted for the benefit of the public."" (*Krolikowski v. San Diego Employees' Retirement System, supra,* 24 Cal.App.5th at p. 568; see *Feduniak v. California Coastal Com., supra,* 148 Cal.App.4th at p. 1381.)

244 Cal.App.4th 267, 282), the standard of review for an order refusing to apply laches is different. "'In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment . . . .'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) Instead, "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law'" because "'the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Ibid.*; see *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 647 [applying this standard to the defenses of waiver and estoppel]; *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734 [applying this standard to an employer's defense of undue hardship in an action under the Fair Employment and Housing Act].)

For purposes of laches, "'"[a] defendant has been prejudiced by a delay when the . . . defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed."'" (*George v. Shams-Shirazi* (2020) 45 Cal.App.5th 134, 142; see *Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1161.) The party asserting laches may either "'affirmatively demonstrate[ ]'" prejudice (*Highland Springs Conference & Training Center v. City of Banning*, *supra*, 244 Cal.App.4th at p. 282), or "the element of prejudice may be 'presumed' if there exists a statute of limitations which is sufficiently analogous to the facts of the case, and the period of

23

such statute of limitations has been exceeded by the public administrative agency in making its claim" (*Fountain Valley Regional Hospital & Medical Center v. Bonta* (1999) 75 Cal.App.4th 316, 323-324; see *Malaga County Water Dist. v. State Water Resources Control Bd.* (2020) 58 Cal.App.5th 447, 463 [discussing the two ways to show prejudice]). The Lents do not contend in their opening brief that an analogous statute of limitations creates a presumption of prejudice (nor did they in the trial court).[6] They instead assert "the Commission's

---

[6] In their reply brief the Lents cite the statutes of limitations applicable to an action alleging a patent or latent deficiency in construction of real property (Code Civ. Proc., §§ 337.1, subd. (a), 337.15, subd. (a)) and an "action upon a statute for a . . . penalty to the people of this state" (*id.,* § 340, subd. (b)). To the extent the Lents argue these statutes of limitations create a presumption of prejudice, the Lents forfeited the argument by not making it in their opening brief. (See *Dumas v. Los Angeles County Bd. of Supervisors* (2020) 45 Cal.App.5th 348, 356, fn. 5.) In any event, none of these statutes would create such a presumption here. A cause of action for construction defect is not analogous to a Commission cease and desist order, which is more akin to an action to enjoin activity inconsistent with easement rights. And even if an action to impose a penalty under Code of Civil Procedure section 340 were analogous, the Commission moved promptly to impose penalties here. The Legislature did not enact section 30821 until June 2014—seven years after the Commission filed its first notice of intent to issue a cease and desist order and began trying to negotiate a resolution with the Lents. The Commission informed the Lents their conduct might expose them to penalties only a few months after the Legislature enacted section 30821 (see Stats. 2014, ch. 35, § 147), and shortly thereafter the Commission served the Lents with a new notice of intent to issue a cease and desist order and impose penalties.

enforcement delay has resulted in the loss of significant evidence concerning the [s]tructures' legality."

A defendant may show prejudice for purposes of laches where delay causes "important evidence . . . to become unavailable." (*City and County of San Francisco v. Pacello* (1978) 85 Cal.App.3d 637, 645; see *Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1420 ["Death of important witnesses may constitute prejudice."].) But the Lents have not shown there was such a loss of important evidence here. The Lents rely on a declaration Warren Lent submitted to the Commission in January 2016 claiming that he had "recently attempted to communicate with the architect that developed the Property as well as the prior Property owner that oversaw the development," but that his "attempts . . . confirmed both these persons died within the past few years." The Lents' argument, however, ignores that the Commission first asked the Lents to remove the structures from the easement area in April 2007—nearly nine years before Warren Lent stated he "recently" tried contacting the prior owner and the architect.[7] There is no evidence the prior owner and the architect were not alive and willing to discuss the history of the property with the Lents in April 2007 when the Commission sought the Lents' consent to remove the structures, nor is there evidence showing how long the Lents waited before attempting to contact the prior owner and the architect. The Lents' evidence did not compel the trial court to find the Commission's purported

_____

[7] In their opening brief the Lents assert the Commission did not notify them until 2010 that the stairway was not permitted. This assertion is contradicted by the Commission's April 2007 letter stating that all "development obstructing the accessway" was unpermitted and should be removed, including the "deck area" (on which the stairway sits).

25

delay in seeking to enforce the terms of the easement caused the Lents' claimed prejudice.

The Lents also suggest the Commission acquiesced in the Lents' maintenance of the unpermitted structures because it knew of the structures by 1993 or, at the latest, 2002.  In contexts other than administrative enforcement actions, a defendant can establish laches by showing either that the plaintiff's unreasonable delay caused him or her prejudice or that "the plaintiff has acquiesced in the act about which the plaintiff complains."  (*Johnson v. City of Loma Linda, supra*, 24 Cal.4th at p. 77.)  Even assuming laches can bar an administrative enforcement action where the agency acquiesces to a defendant's conduct (and there is no showing of prejudice), the Lents' evidence did not compel the trial court to find the Conservancy and Commission acquiesced here.  The Conservancy notified the prior owner in 1993 that the easement was closed temporarily because the Conservancy had not retained a management agency to open the easement for public use, but that the gate violated the terms of the easement and the owners would need to remove the gate either immediately or, at the latest, when the Conservancy was ready to develop the easement.  The Lents submitted no evidence the Commission or the Conservancy agreed that any of the structures could remain permanently.  (See *Pacific Hills Homeowners Assn. v. Prun* (2008) 160 Cal.App.4th 1557, 1565 [despite delays by a homeowners' association in seeking to enforce setback requirements governing a homeowner's gate, the homeowner could not show the association acquiesced where the association "made its opposition to the gate known from the moment it was built, and it never changed its position or communicated to defendants it had changed its position"]; *Wells*

*Fargo Bank v. Goldzband* (1997) 53 Cal.App.4th 596, 632 [the California Division of Oil and Gas did not acquiesce by failing for 16 years to require a mineral rights owner to plug and abandon oil wells, where there was no evidence the agency agreed the owner was not responsible for plugging and abandoning the wells]; *Tustin Community Hospital, Inc. v. Santa Ana Community Hospital Assn.* (1979) 89 Cal.App.3d 889, 899 ["[m]ere delay on the part of the plaintiff does not necessarily indicate an actual willingness that the defendant may continue his invasion of the plaintiff's rights" sufficient to show acquiescence].)

C.     *The Lents Received Adequate Notice of the Penalty*

"[P]rocedural due process 'does not require any particular form of notice . . . .'" (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 990; accord, *Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 860 (*Pacific Gas*).) ""'If the [administrative remedy] provides for reasonable notice and a reasonable opportunity to be heard, that is all that is required.'"" (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 936, fn. 7, brackets in original; see *Pacific Gas*, at p. 860 ["All that is required is that the notice be reasonable."].)

The Lents had reasonable and sufficient notice.  As the Commission correctly argues, due process does not require an administrative agency to notify an alleged violator of an exact penalty the agency intends to impose, so long as the agency provides adequate notice of the substance of the charge.  For example, in *Pacific Gas*, *supra*, 237 Cal.App.4th 812 a gas pipeline operator challenged a $14,350,000 penalty imposed by the Public Utilities Commission (PUC), which the PUC based in

27

part on a provision authorizing daily penalties of $50,000 for a continuing violation. (*Id*. at pp. 832-833.) The court held the PUC provided adequate notice by sending the operator an order to show cause informing it of the rule it violated, of the conduct constituting the violation, and that the violation could expose the operator to penalties under an applicable section of the Public Utilities Code, even though the PUC did not cite the section of the code permitting it to impose daily penalties for a continuing violation. (*Id*. at p. 861.)

Here, the Commission in its 2015 notice of intent informed the Lents how their conduct violated the Coastal Act and provided them with citations to all applicable statutes. And although the Commission did not indicate the specific penalty amount it would impose, it cited section 30821 and stated the Lents' conduct could warrant penalties of up to $11,250 "for each day the violation has persisted or is persisting, for up to five (5) years." The rest was a matter of multiplication; the Lents at that point knew all they needed to know about the potential penalty they faced, how the Commission would calculate it, and why.

But there was more: Two weeks before the hearing the Commission staff issued its recommended findings and order and sent a copy to counsel for the Lents. Not only did the staff describe in further detail how the Lents violated the Coastal Act and why their conduct warranted penalties under section 30821, but the staff attached all of the evidence it relied on to reach its conclusions. While the Commission staff recommended a penalty of between $800,000 and $1,500,000 "in an effort to be extraordinarily conservative in th[e] first unilateral imposition of administrative penalties," it also specifically advised the Lents that the Commission could impose a penalty of "up to $8,370,000"

28

and that "application of [the statutory] factors would support the imposition of a higher end penalty in the matter close to the $8 million" or "a penalty in the middle range . . . near $4 million . . . ."

Of course, under some circumstances an agency may violate due process by indicating it intends to impose a certain penalty, but subsequently deciding to impose a greater penalty, without giving the person an additional opportunity to respond. For example, in *Tafti v. County of Tulare* (2011) 198 Cal.App.4th 891 the county served a notice ordering the owner of a gasoline station to pay a $138,824 penalty, but informed him he could request a hearing to challenge the order. (*Id.* at pp. 894-895.) The court in *Tafti* vacated the $1,148,200 penalty an administrative law judge subsequently imposed during the hearing, holding the county did not adequately inform the owner it might increase the penalty at the hearing. (*Id.* at pp. 898-900.) But the circumstances here are different. The Commission staff informed the Lents that its recommended penalty range of $800,000 to $1,500,000 was just that—a recommendation—and that the Commission could impose a penalty of up to $8,370,000. Moreover, by the time the Commission staff sent its notice of intent to issue a cease and desist order and impose penalties, the Lents, through counsel, had exchanged correspondence with the Commission about the unpermitted developments. The Lents and their attorneys received adequate notice of the potential penalty.

The Lents argue they "could not present" evidence of whether the penalty imposed by the Commission "might be" constitutionally excessive, and could not have "fully appreciated" "the importance" of other evidence, until the commissioners

29

began deliberating a potential penalty higher than the penalty recommended by the Commission staff. Therefore, according to the Lents, due process required the Commission to give them an opportunity to submit additional evidence after the Commission decided to impose the penalty. Not true. The Lents knew in September 2015, long before the Commission staff made a recommendation on the amount of a penalty, that the Commission might impose daily penalties of up to $11,250. The Lents filed a statement of defense and a supplemental statement of defense, but never raised a constitutional objection to the potential size of the penalty. At the hearing, neither the Lents' attorneys nor Warren Lent argued that the potential size of the penalty was constitutionally excessive or that the Lents needed additional time to submit evidence relevant to the statutory penalty factors under section 30820, subdivision (c), even though the Commission had specifically informed the Lents two weeks before the hearing that the Commission could impose a penalty of up to $8,170,000. In addition, even if the Commission somehow reduced the Lents' motivation or incentive to submit relevant evidence by recommending a penalty of "only" up to $1,500,000, the Lents have not identified what additional evidence they would have submitted had the Commission staff recommended a larger penalty.[8]

---

[8] In its cross-appeal, the Commission asserts the trial court "erred by remanding based on finding that the Commission focused overly on deterrence" and "by finding that the second penalty factor, on susceptibility to remediation, did not support imposition of a penalty." Because the trial court did not make either finding, and the Lents do not mention either finding in

D.    *The Lents Have Not Shown They Received Inadequate Procedural Protections*

The Lents contend that, even if they received sufficient notice of the potential penalty, section 30821 is unconstitutional on its face because it allows the Commission to impose substantial penalties without giving alleged violators sufficient procedural protections.  In the alternative, the Lents contend section 30821 is unconstitutional as applied to them.  Neither contention has merit.

1.    *Applicable Law*

"Both the federal and state Constitutions compel the government to afford persons due process before depriving them of any property interest."  (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 212 (*Today's Fresh Start*).)  "'The essence of due process is the requirement that "a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it."'  [Citations.]  The opportunity to be heard must be afforded 'at a meaningful time and in a meaningful manner.'"  (*Ibid.*)  In determining "'"the quantum and quality of the process due in a particular situation"'" . . . the United States Supreme Court [in *Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [96 S.Ct. 893, 47 L.Ed.2d 18] (*Mathews*)] has rejected absolute rules in favor of balancing three considerations:  'First, the private interest that will be affected by the official action; second, the risk of an

_____

their opening brief, we do not address the Commission's assertion.

31

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" (*Today's Fresh Start,* at pp. 212-213.)  California courts "also consider a fourth factor, the '"dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official."'" (*Id.* at p. 213.)  "In other words, what would the proposed additional procedures add to the fairness and accuracy of the proceedings actually held, and is any such additional benefit constitutionally necessary in light of the respective interests at stake?" (*Id.* at pp. 228-229.)

> 2.     *The Lents Have Not Shown Section 30821 Is Unconstitutional on Its Face*

As the California Supreme Court stated in *Today's Fresh Start*, *supra*, 57 Cal.4th 197, the "standard for a facial constitutional challenge to a statute is exacting.  It is also the subject of some uncertainty." (*Id.* at p. 218.)  Under one standard, courts "will not invalidate a statute unless it 'pose[s] a present total and fatal conflict with applicable constitutional prohibitions.'" (*California School Boards Assn. v. State of California* (2019) 8 Cal.5th 713, 723-724; see *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 338.)  Under "'a more lenient standard,'" courts ask "'whether the statute is unconstitutional "in the generality or great majority of cases."'" (*California School Boards Assn.,* at p. 724; see *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118,

32

1138.)  "Either way, we consider only the text and purpose of the statute, and 'petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute.'" (*California School Boards Assn.*, at p. 724.)  The Lents' facial constitutional challenge, even under the more lenient standard, fails.

"[P]rocedural due process does not require a trial-type hearing in every instance."  (*Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 392.)  "To the contrary, '[i]n general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action.'" (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 228.)  Courts have rejected challenges to administrative proceedings that did not provide the kind of procedural protections the Lents complain section 30821 does not provide, including the right to call witnesses and examine adverse witnesses (see, e.g., *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1122; *James v. City of Coronado* (2003) 106 Cal.App.4th 905, 912; *Stardust Mobile Estates, LLC v. City of San Buenaventura* (2007) 147 Cal.App.4th 1170, 1189); the right to exclude unsworn testimony (see *E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 324; *Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 298); and the right to subpoena witnesses (*Mohilef*, at p. 303; cf. *Cimarusti v. Superior Court* (2000) 79 Cal.App.4th 799, 808-809 ["[g]enerally, there is no due process right to prehearing discovery in administrative hearing cases"]).

In support of their due process argument, the Lents discuss primarily the first *Mathews* factor, asserting that section 30821 allows the Commission to impose substantial penalties of up to

33

$20,000,000 against property owners, "akin to the deprivation of one's means of livelihood." It is true that due process may require a proceeding that more closely resembles a trial when, for example, "action by the state significantly impairs an individual's freedom to pursue a private occupation." (*Oberholzer v. Commission on Judicial Performance*, *supra*, 20 Cal.4th at p. 392.) While the Commission certainly has the potential to impose significant penalties, this potential has less relevance to the Lents' facial challenge because section 30821 does not require the Commission to impose a minimum penalty if it determines a property owner has violated the Coastal Act. (See *People ex rel. Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 522-523 [statutory penalty is less likely to violate due process where the statute gives the adjudicator discretion in determining the amount of the penalty].) To prevail on their facial challenge, the Lents must show not only that the Commission has the potential to impose penalties large enough to violate due process under the informal hearing procedures of section 30821, but (under the standard more lenient to them) that in the generality or the great majority of cases the Commission's imposition of a fine would violate due process. They did not make such a showing here. The Commission has discretion to impose a daily penalty of up to $11,250 for a violation of the Coastal Act, but it does not have to do so, even where it determines a property owner has violated the Coastal Act. Moreover, under section 30821, subdivision (h), the Commission may not impose a penalty if the alleged violator can correct the violation within 30 days of receiving notification of the violation without undertaking additional development that requires a permit.

34

Turning to the second *Mathews* factor, neither the Lents nor the Commission discusses the procedures available to alleged violators in proceedings under section 30821.  But several provisions of the Coastal Act and the regulations adopted by the Commission are designed to ensure alleged violators have a meaningful opportunity to be heard.   The Commission may only impose penalties after "a duly noticed public hearing" on a cease and desist or restoration order or after a hearing on a notice of intent to record a violation of the Coastal Act.  (See §§ 30810-30812, 30821, subd. (b).)  Prior to the hearing, the executive director of the Commission must give the alleged violator notice of the Commission's intent to issue the order. (§ 30812, subd. (a); Cal. Code Regs., tit. 14, §§ 13181, subd. (a), 13191, subd. (a).)  In the case of a notice of intent to issue a cease and desist order (the procedure used here) or a restoration order, the executive director must attach a statement of defense form and give the alleged violator at least 20 days to respond, with the executive director having discretion to grant additional time. (Cal. Code Regs., tit. 14, §§ 13181, subds. (a) & (b), 13191, subds. (a) & (b).)  Prior to the hearing the director must prepare and distribute to the alleged violator a written recommendation on the proposed order that includes "a brief summary of (A) any background to the alleged violation, (B) the allegations made by staff in its violation investigation, (C) a list of all allegations either admitted or not contested by the alleged violator(s), (D) all defenses and mitigating factors raised by the alleged violator(s), and (E) any rebuttal evidence raised by the staff to matters raised in the alleged violator's assertion of any defense or mitigating factor with references to supporting documents." (*Id.*, § 13183, subd. (b)(2); see *id.*, § 13193, subd. (b)(2).)  At the

35

hearing the Commission staff must summarize its investigation and proposed findings, and the alleged violator may present his or her position. (*Id.*, §§ 13185, subds. (c) & (d), 13195.) The alleged violator may also ask to submit "evidence that could not have been set forth in a statement of defense form," in which case the Commission may postpone the matter until later in the meeting or continue the matter to a subsequent meeting. (*Id.*, §§ 13185, subd. (d), 13195.) Any speaker, including the alleged violator, may submit questions to the Commission to ask other speakers. (*Id.*, §§ 13185, subd. (g), 13195.)[9]

Although not as robust as trial-like proceedings, these procedures guarantee that a property owner has notice of the alleged violations, an opportunity to present evidence, notice of the recommendation by the Commission staff and supporting evidence prior to the hearing, and an opportunity to present a defense prior to and at the hearing. The Lents do not explain why these protections are insufficient in the generality or in the great majority of cases. (See *Today's Fresh Start, supra*, 57 Cal.4th at pp. 229-230 [charter school had a meaningful opportunity to be heard where it had "notice of the alleged deficiencies in its operations and numerous chances to respond, in writing and orally, with evidence and arguments for why its charter should not be revoked"].)

Moreover, to prove the existence of an unpermitted development, the Commission, as it did here, will generally rely

_____

[9]    Title 14 of the California Code of Regulations does not include specific procedural requirements for hearings on a notice of intent to record a violation, but section 30812, subdivision (d), of the Public Resources Code requires that the owner have an opportunity to present evidence at the public hearing.

36

on documentary evidence. "Unlike cases that turn upon the testimony of live witnesses, cases involving documentary evidence do not carry a critical need to inquire into credibility via cross-examination." (*Stardust Mobile Estates, LLC v. City of San Buenaventura*, *supra*, 147 Cal.App.4th at p. 1189; see *Oberholzer v. Commission on Judicial Performance*, *supra*, 20 Cal.4th at p. 393 [superior court judge was not entitled to a trial-like evidentiary hearing to contest an advisory letter from the Commission on Judicial Performance because that commission's "inquiry lent itself well to proof through documentary forms of evidence"]; cf. *Manufactured Home Communities, Inc. v. County of San Luis Obispo* (2008) 167 Cal.App.4th 705, 711 [cross-examination "is especially important where findings against a party are based on an adverse witness's testimony"].) And even in cases where the Commission's findings may depend on the testimony of a percipient witness, the proceedings, as discussed, allow the alleged violator to submit questions to the commissioners to ask witnesses. (See *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1084 [due process did not guarantee a student accused of sexual assault the right to cross-examine the complainant where the student could submit written questions to the university's disciplinary review panel, even though the panel's findings were "likely to turn on the credibility of the complainant, and respondent face[d] very severe consequences"].)

Nor have the Lents shown that additional, trial-like procedures would significantly reduce the risk that the Commission would impose a fine that is not justified under the statutory penalty factors. As the California Supreme Court explained in *People v. Ramirez* (1979) 25 Cal.3d 260, when a

37

decision "is evaluative in nature" and "depends on consideration of a host of intangible factors rather than on the existence of particular and contestable facts," formal hearing procedures aimed at "promoting accuracy and reliability," like cross-examination, are less important "because of the difficulties inherent in challenging the subjective aspects of an evaluative-type decision." (*Id.* at pp. 275-276.) Section 30820, subdivision (c), lists five factors the Commission must consider before imposing the penalty. At least three of them are or include intangible factors that do not necessarily depend on contestable facts: the "nature, circumstance, extent, and gravity of the violation"; the "sensitivity of the resource affected by the violation"; and "[w]ith respect to the violator, . . . the degree of culpability . . . and such other matters as justice may require." (§ 30820, subd. (c)(1)-(5).)[10]

Regarding the final *Mathews* factor, the Commission argues it has an important interest in imposing penalties using informal procedures to efficiently resolve violations of the Coastal Act and deter future violations. Certainly the Commission has an interest in efficiently remedying violations of the Coastal Act. And although the Commission could implement additional procedural protections for alleged violators in proceedings under section 30821, courts give some deference to the procedures an agency has adopted in enforcement proceedings, even if those proceedings do not include a full, trial-like evidentiary hearing.

---

[10] Arguably, the other factors the Commission must consider depend more on contestable facts, such as whether the violation is susceptible to restoration or remediation efforts, the cost to the state of bringing the action, and whether the violator has undertaken any remediation efforts.

As the California Supreme Court stated in *Today's Fresh Start, supra*, 57 Cal.4th 197, "'"legislatures and agencies have significant comparative advantages over courts in identifying and measuring the many costs and benefits of alternative decisionmaking procedures. Thus, while it is imperative that courts retain the power to compel agencies to use decisionmaking procedures that provide a constitutionally adequate level of protection . . . , judges should be cautious in exercising that power. In the vast bulk of circumstances, the procedures chosen by the legislature or by the agency are likely to be based on application of a *Mathews*-type cost-benefit test by an institution positioned better than a court to identify and quantify social costs and benefits."'" (*Id.* at p. 230; see *Marvin Lieblein, Inc. v. Shewry* (2006) 137 Cal.App.4th 700, 723 [acknowledging "the administrative and fiscal burden of requiring a full evidentiary hearing with live testimony"]; *Mohilef v. Janovici, supra,* 51 Cal.App.4th at p. 301 ["'Courts should be particularly cautious in deciding whether to require an agency to provide a procedure that has the potential to impose significant costs, such as a right to cross-examine.'"].)[11]

---

[11] The Lents do not make any specific arguments regarding the fourth factor California courts consider, the dignitary interests of the individual. The California Supreme Court has emphasized that this factor largely concerns ensuring individuals have the opportunity to meaningfully participate in proceedings. (See *People v. Allen* (2008) 44 Cal.4th 843, 869 [defendants have a "dignitary interest in being heard," and the "government has no interest in assuming a paternal role to prevent a defendant from pursuing a strategically misguided path"]; *People v. Ramirez, supra,* 25 Cal.3d at p. 275 ["'Only through [oral] participation can the individual gain a meaningful understanding of what is

One of the Lents' primary arguments is not based on any of the three *Mathews* factors. They argue section 30821 is unconstitutional on its face because it permits the Commission to impose a "quasi-criminal" penalty, but does not guarantee property owners and other alleged violators the "formalities usually afforded the accused in the quasi-criminal context." The Lents contend that, by enacting the provision that allows the Commission to impose an administrative penalty, the Legislature intended, in part, to punish those who violate the Coastal Act. Citing *Austin v. United States* (1993) 509 U.S. 602 [113 S.Ct. 2801, 125 L.Ed.2d 488], the Lents argue that section 30821 therefore creates a quasi-criminal proceeding.[12]

The problem with the Lents' argument is that it conflates different constitutional protections. In *Austin v. United States*, *supra*, 509 U.S. 602 the United States Supreme Court considered the Excessive Fines Clause of the Eighth Amendment to the

_____

happening to her, and why it is happening. Moreover, providing the opportunity to react . . . promote[s] the feeling that, notwithstanding the substantive result, one has been treated humanely and with dignity by one's government."'].) As discussed, the Commission's procedures adequately account for the dignitary interests of the individual.

[12] The Lents also cite *People v. Ruiz* (2018) 4 Cal.5th 1100, where the California Supreme Court considered whether a criminal laboratory analysis fee and drug program were "punishment" for purposes of "Penal Code section 182, subdivision (a)—which provides that persons convicted of conspiring to commit a felony 'shall be punishable in the same manner and to the same extent as is provided for the *punishment* of that felony.'" (*Ruiz,* at p. 1106.) Neither *Ruiz* nor Penal Code section 182 has anything to do with this case.

40

United States Constitution—not the due process balancing test described in *Mathews*.  (See *Austin,* at p. 604.)  The Supreme Court held that a "'civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment' . . . and, as such, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause."  (*Austin,* at pp. 621-622.)  But even assuming a penalty imposed under section 30821 is a "fine" subject to the limitations of the Excessive Fines Clause (an issue we will discuss), that does not guarantee alleged violators all the "formalities usually afforded the accused" in criminal proceedings.  For example, it is the Sixth Amendment, not the Eighth Amendment, that guarantees the accused in criminal prosecutions the right to confront witnesses (one of the protections the Lents complain section 30821 does not afford them), and courts do not use the Excessive Fines analysis of *Austin* to determine the proceedings to which the protections of the Sixth Amendment apply.  (See, e.g., *Lewis v. United States* (1996) 518 U.S. 322, 325 [116 S.Ct. 2163, 135 L.Ed.2d 590]; *Gardner v. Appellate Division of Superior Court* (2019) 6 Cal.5th 998, 1003.)

The California Supreme Court in *People v. Superior Court (Kaufman)* (1974) 12 Cal.3d 421 similarly explained that the punitive nature of a penalty does not guarantee an accused the Fifth Amendment privilege against self-incrimination.  In that case the government sought to impose civil penalties on an individual for deceptive advertising, and the individual invoked his Fifth Amendment privilege against self-incrimination to avoid answering questions at a deposition, arguing the proceeding was criminal in nature because of the substantial penalties the

41

individual faced.  (See *id*. at pp. 424-425, 429.)  In rejecting the individual's privilege assertion, the Supreme Court explained that a civil penalty for deceptive advertising "is unquestionably intended as a deterrent against future misconduct and does constitute a severe punitive exaction by the state, but neither it nor the process by which it is imposed is deemed criminal in nature for such reasons.  The penalty does not include, for instance, the stigma of a criminal conviction nor does it permit such alternative punishment as the loss of personal freedom with which a defendant in a criminal action is threatened."  (*Id*. at p. 431, fn. omitted.)

In their reply brief the Lents assert that, "[b]y definition, a quasi-criminal penalty is more serious than a purely civil remedy, and that point is appropriately considered in the balancing-factor analysis under procedural due process."  But the Legislature has characterized the penalty imposed under section 30821 as an "administrative civil penalty" (§ 30821, subd. (a)), not a "criminal" penalty or fine.  Like the civil penalty the Supreme Court considered in *Kaufman*, a penalty imposed under section 30821 does not expose the defendant to the stigma of a criminal conviction.  The Lents do not explain why an individual has a greater interest in avoiding an administrative civil penalty simply because the Legislature intends the penalty (in part) to deter future unlawful conduct.

### 3. *The Lents Have Not Shown Section 30821 Is Unconstitutional as Applied to Them*

The party challenging a statute that is facially valid has "the burden of evincing facts to show that it was unconstitutional as applied."  (*Associated Homebuilders of Greater East Bay, Inc.*

*v. City of Livermore* (1961) 56 Cal.2d 847, 854; accord, *Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145.)  The Lents' opening brief (but not their petition) includes a one-paragraph argument that section 30821, even if not unconstitutional on its face, it is unconstitutional as applied to them because the Commission imposed a large penalty.  There may be instances where an agency, by imposing a substantial penalty without giving the alleged violator a fair opportunity to present a defense, infringes on the alleged violator's due process rights.  For example, in *Manufactured Home Communities, Inc. v. County of San Luis Obispo*, *supra*, 167 Cal.App.4th 705 a county rent control board determined, based primarily on the testimony of tenants, that a mobilehome park operator violated a rent control ordinance.  (*Id.* at p. 708.)  The court held the county violated the operator's due process rights because the county "found the tenants' testimony to be credible and 'never rebutted,'" but "did not allow [the operator] to test the tenants' veracity or rebut the testimony through cross-examination."  (*Id.* at p. 712.)

The Lents, however, have not identified any specific procedural protection they contend was necessary to avoid an erroneous deprivation of their interests.  They do not contend, for example, that they needed to cross-examine or otherwise question a particular witness the Commission relied on or that they needed to subpoena a particular witness who was unwilling to testify.  The Lents simply reiterate that they were entitled to all of the "traditional checks against arbitrary and unfair adjudication" afforded in trial-like proceedings, without explaining how these additional protections, as applied to them,

43

could have made any difference.  Accordingly, the Lents' as-applied challenge fails.

E.      *The Lents Have Not Shown the Commissioners Are Biased Adjudicators*

The Lents next contend the commissioners are biased adjudicators in proceedings to impose penalties under section 30821.  Where "'an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal.'" (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 215; see *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737.)  Unlike California's statutory scheme, in which "an explicit ground for judicial disqualification . . . is a public perception of partiality, that is, the appearance of bias," the constitutional due process guarantee of a fair tribunal "focuses on actual bias."  (*People v. Freeman* (2010) 47 Cal.4th 993, 1001.)  "A fair tribunal is one in which the judge or other decision maker is free of bias for or against a party." (*Morongo*, at p. 737.)  "Violation of this due process guarantee can be demonstrated not only by proof of actual bias, but also by showing a situation 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" (*Ibid.*; see *Freeman,* at p. 1001.)  "Claims that an adjudicator is biased are not subject to balancing under the federal *Mathews* or state *Mathews*-plus test." (*Today's Fresh Start*, at p. 216.)  "'[T]he burden of establishing a disqualifying interest rests on the party making the assertion.'" (*Id.* at p. 221.)

Quoting (part of) section 30001.5, subdivision (c), the Lents argue the commissioners are biased adjudicators because the

44

Coastal Act directs them to "[m]aximize public access to and along the coast." The Lents' quotation, however, is misleadingly selective. The complete text of section 30001.5, subdivision (c), states that the "basic goals of the state for the coastal zone" include maximizing "public access to and along the coast and maximiz[ing] public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners." Section 30210, which the Lents also cite, states that access "shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse." The Lents' argument is also based on a false premise. Section 30001.5 does not direct or require the commissioners to do anything; it is a statement of the Legislature's declarations and findings in adopting the Coastal Act. That commissioners "may be sympathetic towards the objectives of the Act is not a valid criticism. . . . 'Administrators who are unsympathetic toward the legislative program are very likely to thwart the democratic will; the way to translate legislative policies into action is to secure administrators whose honest opinions—biases—are favorable to those policies.'" (*CEEED v. California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 328-329; see *Today's Fresh Start*, *supra*, 57 Cal.4th at p. 222 [we "presum[e] that agency adjudicators are people of '"conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances"'"].)

The Lents also argue the commissioners are biased because they can raise revenue for the Commission by imposing penalties under section 30821. "[I]nstitutional financial interests alone,

even without any corresponding personal benefit, may compromise due process." (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 217.) Here, the revenue derived from penalties imposed under section 30821 is not collected by the Commission; it is deposited into the Violation Remediation Account of the Coastal Conservancy Fund. (See § 30821, subd. (j).) But section 30823 requires the Conservancy to expend funds "for carrying out the provisions" of the Coastal Act "when appropriated by the Legislature." The Commission has "primary responsibility for the implementation of the provisions" of the Coastal Act (§ 30330), which includes "manag[ing] and budget[ing] any funds that may be appropriated, allocated, granted, or in any other way made available to the commission for expenditure." (§ 30340.) Therefore, the commissioners know the revenue from penalties imposed under section 30821 will be used (if at all) to carry out the provisions of the Coastal Act, which by statute they are required to implement (although it is not clear from the record how the Commission exercises, and whether it delegates any of, its executive authority). That individuals with both executive and adjudicative functions can raise revenue by imposing penalties in adjudicative proceedings may, but does not necessarily, show the individuals have a sufficient institutional financial interest to violate due process.

The United States Supreme Court has held that an official is not an impartial adjudicator where the official has executive responsibilities, the official can impose fines in adjudicative proceedings to fulfill his or her executive responsibilities, and the fines constitute a "substantial" or "major" part of the revenue of the organization the official oversees. For example, in *Tumey v. State of Ohio* (1927) 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749]

46

(*Tumey*) the Supreme Court held that the mayor of a village was not an impartial adjudicator for a defendant who was charged with unlawfully possessing liquor because the mayor was the "chief executive of the village . . . charged with the business of looking after the finances of the village" and "substantial sums were expended out of the village treasury, from the fund made up of the fines" imposed on defendants convicted under the applicable prohibition statutes. (*Id.* at pp. 521, 532.)[13] The Supreme Court observed, however, that "the mere union of the executive power and the judicial power in [a person] cannot be said to violate due process of law" and that the "minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the mayor may pronounce final judgment . . . , do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact." (*Ibid.*) Similarly, in *Ward v. Village of Monroeville* (1972) 409 U.S. 57 [93 S.Ct. 80, 34 L.Ed.2d 267] (*Ward*) the United States Supreme Court held that the mayor of a village who convicted and fined a defendant for traffic offenses was not impartial where the mayor had "wide executive powers," "account[ed] annually to the [village] council respecting village finances," and had "general overall supervision of village affairs," and where a "major part of village income [was] derived from the fines, forfeitures, costs, and fees imposed by him in his mayor's court." (*Id.* at pp. 58, 60.)

---

[13] The Supreme Court separately held the mayor was not impartial because he personally received compensation if he convicted the defendant, but not if he acquitted the defendant. (*Tumey, supra,* 273 U.S. at pp. 523, 531-532.)

In contrast, the court in *Alpha Epsilon Phi Tau Chapter Housing Assn. v. City of Berkeley* (9th Cir. 1997) 114 F.3d 840 (*Alpha Epsilon*) held a city's rent stabilization board that decided appeals over whether units were subject to the city's rent control ordinance was an impartial adjudicator, even though the board could impose fees and penalties to raise revenue. "In its executive capacity, the Board control[led] the rents that landlords may charge for properties subject to the ordinance," administered "its own budget," and was "responsible for its own funding." (*Id.* at p. 842.) If the board ruled a unit was subject to rent control, the owner had to pay an annual registration fee and penalties for late payments, which went to the board's budget. Distinguishing *Tumey* and *Ward*, the court in *Alpha Epsilon* held the arrangement did not violate due process because the board did not have a strong enough interest in adjudicating proceedings against landlords to "'reasonably warrant [a] fear of partisan influence on [the] judgment.'" (*Alpha Epsilon,* at pp. 846-847; see *Commonwealth of the Northern Mariana Islands v. Kaipat* (1996) 94 F.3d 574, 575.) The court explained that, although the board's role as both "adjudicator of coverage and executor of its finances may be a less than optimal design for due process purposes," the "amount of the budget at stake" from the registration fees and penalties "in any year—at a maximum of five percent—is rather small." (*Alpha Epsilon*, at p. 847.) The court also concluded that the board's "ability to recoup losses" and "seek funding from the City and other sources . . . further attenuate[d its] financial motivations" and that the board "regularly waive[d] penalties" and recently had a surplus. (*Ibid.*)

The Coastal Act places some check on the Commission's ability to use revenue derived from penalties imposed under

48

section 30821 by requiring that the Legislature appropriate and the Conservancy expend the funds.  (See § 30823; see also § 30821, subd. (i)(3) [requiring the Commission to submit to the Legislature a report of administrative penalties imposed under section 30821].)  More importantly, the Lents submitted no evidence in the trial court of how much money the Legislature generally appropriates or the Conservancy spends from the Violation Remediation Account to carry out the provisions of the Coastal Act.  Nor did the Lents submit evidence of the Commission's annual budget or of how much of its budget (if any) the Commission generally receives from expenditures from the Violation Remediation Account.  The Coastal Act may give the commissioners at least some incentive to impose substantial fines under section 30821, just as the budgetary system in *Alpha Epsilon* gave the board some incentive to recover registration fees and impose late payment penalties on landlords.  (See *Alpha Epsilon*, *supra*, 114 F.3d at p. 847.)  But absent some additional evidence showing how much the commissioners rely on the penalties to carry out their executive duty to implement the Coastal Act, we cannot determine whether the commissioners' motives are strong enough to reasonably warrant a "fear of partisan influence" on the Commission's judgment or to cause the commissioners "'not to hold the balance nice, clear, and true between the state and the accused.'"  (*Ibid.*; see *Ward, supra*, 409 U.S. at p. 60.)  The Lents did not meet their burden of showing the commissioners have a strong enough institutional financial interest in the penalties they impose to create a constitutionally impermissible risk of bias.

In connection with their opening brief, the Lents ask us to take judicial notice of a memorandum of understanding (MOU)

between the Commission and the Conservancy, titled Use and Expenditure of Violation Remediation Account Funds. According to the Lents, the MOU shows the executive director of the Commission has "final say" on how penalties deposited into the Violation Remediation Account are used. In their reply brief, the Lents ask us to take judicial notice of even more documents prepared by the Commission and the Conservancy. According to the Lents, these documents show that the Conservancy has made expenditures from the Violation Remediation Account that directly fund the Commission's operations and that the penalty imposed on the Lents would have accounted for approximately 14 percent of the Commission's annual budget for the 2017-2018 fiscal year.

We deny the requests for judicial notice of these documents. The Lents did not ask the trial court to take judicial notice of any of these documents, nor do the Lents explain why they did not submit this evidence in the trial court. (See *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326 ["An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance."]; *County of Los Angeles Department of Public Health v. Superior Court* (2021) 61 Cal.App.5th 478, 486, fn. 3 [same].)

With respect to the MOU, even assuming we could take judicial notice of it as an official act of an agency (see Evid. Code, §§ 452, subd. (c), 459), the Lents ask us to interpret the MOU in a manner that is not obvious from the face of the document. While the MOU states the Conservancy must ask the Legislature to appropriate certain funds in the Violation Remediation Account for specific projects designated by the executive director of the

50

Commission, it also states that, "[i]f the Executive Officer of the Conservancy finds the designation of the Executive Director infeasible, then the Conservancy and the Commission shall consider and agree upon an alternative proposal(s)." It is not clear that, as the Lents assert, the executive director has "final say" on the Conservancy's expenditures, and the extent of the executive director's control over expenditures is a factual question a trial court would have been in a better position to resolve had the Commission had an opportunity to respond.

In addition, several of the documents the Lents ask us in their reply brief to judicially notice, including the document purporting to describe the Commission's annual budget, are memoranda authored by members of the Conservancy and the Commission. "While we may take judicial notice of . . . official acts of state agencies [citation], the truth of matters asserted in such documents is not subject to judicial notice." (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482; see *Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075.) The Lents seek to use the memoranda to prove the purported facts in those documents—namely, that the Conservancy in fact made various expenditures from the Violation Remediation Account to the Commission and that the budget described in the memoranda is in fact the budget the Legislature approved. And even if we could take judicial notice of these documents, the Lents, by waiting until their reply brief on appeal to request judicial notice, prevented the Commission from having an adequate opportunity to respond. (See *Newhall County Water Dist. v. Castaic Lake Water Agency* (2016) 243 Cal.App.4th 1430, 1450 ["[d]enial is particularly appropriate where judicial notice has been requested in support

51

of a reply brief to which the opposing party has no opportunity to respond"].)[14]

The Lents also contend that statements by the individual commissioners at the hearing show the commissioners were biased against them. "A party must allege concrete facts that demonstrate the challenged judicial officer is contaminated with bias or prejudice. 'Bias and prejudice are never implied and must be established by clear averments.'" (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792.) The Lents take issue with the fact that several commissioners recommended fines greater than $4,150,000. Such statements, however, do not show the commissioners had a "personal bias" (*Hauser v. Ventura County Bd. of Supervisors* (2018) 20 Cal.App.5th 572, 580) against the Lents or advocated against them prior to hearing the evidence (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 484). In fact, the commissioners who suggested imposing higher fines justified their positions by discussing permissible

---

[14] Having declined to take judicial notice of these documents, we do not reach the issue of whether the documents show, as argued by the Lents, that the executive director of the Commission—a person appointed by the commissioners who "serve[s] at the pleasure of his or her appointing power" (§ 30335)—has significant input into the Conservancy's expenditures and that those expenditures have occasionally provided funding for the Commission's operations. If penalties imposed by the Commission directly fund the Commission's operations without sufficient oversight and comprise a significant portion of the Commission's budget, there could be a concern the commissioners may have an impermissible institutional interest when deciding whether to impose significant penalties under section 30821 like the penalty the Commission imposed on the Lents.

penalty factors under section 30821, including the public's loss of access to the beach, the many years Commission staff spent trying to remedy the violation, and the Lents' unwillingness to cooperate. (See §§ 30820, subd. (c)(1), (4) & (5), 30821, subd. (c).)

Finally, the Lents argue the "the Commissioners and staff delighted in how they could put the money they raised to use" during the hearing. This is not an accurate description of what occurred at the hearing. There was a brief mention of how revenue is derived from penalties. Commissioner Mark Vargas asked Lisa Haage, the Commission staff's Chief of Enforcement, to clarify how the revenue collected from penalties is allocated. She correctly responded, "It goes to the Violation Remediation Account." She also stated, "If you had creative ideas of what to do with $200,000, certainly there would be more that's possible to do with whatever amount you impose today," and she suggested that "one option might be to fund the construction of this access way."[15] While Commissioner Vargas later repeated Haage's suggestion, he emphasized that the Lents' violation was "egregious" and that they were unwilling to remedy the violation. None of the other commissioners discussed how the Commission could potentially use revenue derived from the penalty or justified imposing higher penalties on the Lents based on the potential revenue for the Commission. Nor did the Commission discuss the potential revenue from the penalty in its adopted findings and order.

---

[15]    It is not clear what $200,000 Haage was referring to. The Commission staff did not recommend, and none of the commissioners discussed, imposing a $200,000 fine on the Lents.

F.    *The Lents Have Not Shown the Penalty Violated the Constitutional Prohibition on Excessive Fines*

The Lents' final argument is that the $4,150,000 penalty violates the federal and state constitutional prohibition on excessive fines.  It does not.

Both the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution prohibit excessive fines.  (See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 727-728.)[16] "'[T]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality,'" which courts assess by considering "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay."  (*Ibid.*; see *United States v. Bajakajian* (1998) 524 U.S. 321, 334 [118 S.Ct. 2028, 141 L.Ed.2d 314].)  A fine is constitutionally excessive only if it is "grossly disproportionate to the offense[ ] . . . ."  (*People v. Braum* (2020) 49 Cal.App.5th 342, 359; see *Bajakajian,* at p. 334 ["a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense"]; *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1322 [same].)  Because the Commission does not dispute that the penalty imposed on the Lents is a fine for purposes of the Excessive Fines Clause, we consider whether the penalty is grossly

---

[16]    The Excessive Fines Clause of the Eighth Amendment is applicable to the states through the Fourteenth Amendment.  (*Timbs v. Indiana* (2019) ___ U.S. ___, ___ [139 S.Ct. 682, 686-687, 203 L.Ed.2d 11].)

disproportionate to the Lents' violation under the factors in *Lockyer* and *Bajakajian*.

"'We review de novo whether a fine is constitutionally excessive and therefore violates the Eighth Amendment's Excessive Fines Clause.' [Citations.] '[F]actual findings made by the [trial court] in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous.'" (*Sweeney v. California Regional Water Quality Control Bd.* (Feb. 18, 2021, A153583) ___ Cal.App.5th ___, ___ [2021 Cal.App.Lexis 243, p. 81], as modified Mar. 18, 2021.) We review the "underlying factual findings . . . for substantial evidence, viewing the record in the light most favorable to the ruling." (*People v. Braum, supra*, 49 Cal.App.5th at p. 360.)

### 1. *The Lents' Culpability*

Relying on a declaration Warren Lent filed in the Commission proceeding, the Lents contend they had "minimal culpability" because they believed in "good-faith . . . that they were not violating any public access provisions." The trial court found the Lents had a high degree of culpability because they willfully retained unpermitted structures and deliberately refused to remove those structures for over nine years after the Commission notified them the structures violated the Coastal Act. The court's finding was not clearly erroneous. Although Warren Lent stated he did not realize the structures were unpermitted, the trial court was not required to find that statement credible, particularly given that the Conservancy recorded its acceptance of the public easement and the Commission notified the Lents in 2007 that the structures were not permitted and that they encroached on the public access

55

easement. The Commission sent multiple letters to the Lents or counsel for the Lents over the next several years asking them to remove the structures and explaining the Conservancy could not develop the accessway until they did so. Still, the Lents refused to remove the structures.

Citing *United States v. Goodwin* (1982) 457 U.S. 368 [102 S.Ct. 2485, 73 L.Ed.2d 74], where the United States Supreme Court held that "to punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort'" (*id.* at p. 372), the Lents argue the Commission impermissibly punished them for exercising their right to defend themselves in the enforcement proceeding.[17] But the trial court did not find the Lents culpable because they attempted to defend themselves. The court found the Lents culpable because they continued to violate the law by refusing to remove the unpermitted structures. And courts routinely consider a person's unwillingness to comply with the law when considering whether a fine is excessive under the Eighth Amendment. (See *People v. Braum*, *supra*, 49 Cal.App.5th at p. 361 [landlord's flagrant disobedience of city ordinances and court orders demonstrated his culpability]; *City and County of San Francisco v. Sainez*, *supra*, 77 Cal.App.4th at p. 1322 [landlord's "numerous instances of ignoring or disobeying orders to abate or rectify substandard housing conditions affecting the public health and safety" demonstrated his culpability];

---

[17] The defendant in *United States v. Goodwin, supra*, 457 U.S. 368 moved to set aside a verdict on the ground of prosecutorial vindictiveness, contending the prosecutor indicted him on a felony charge in retaliation for not pleading guilty to a misdemeanor charge. (See *id*. at pp. 371-372.)

*Ojavan II, supra*, 54 Cal.App.4th at p. 398 [$9.5 million penalty imposed by the Commission was not excessive, in part because of the investor's "flagrant disregard of the . . . restrictions" on development].)

### 2. *The Relationship Between the Harm and the Penalty*

The trial court found the Conservancy could have built a public accessway if the Lents had removed the structures in the easement area, although the court stated it was not clear "how long it would have taken" for the Conservancy to complete the accessway. Again, the trial court's finding was not clearly erroneous. The Conservancy hired contractors in 2008 to complete a survey of the property and in 2010 to design conceptual plans. The executive officer of the Conservancy submitted a letter to the Commission stating the Conservancy's draft feasibility study showed no serious physical impediments, other than the Lents' refusal to remove the structures, to the development of public access improvements. And both the executive officer and another member of the Conservancy confirmed this during the hearing. Even if it was uncertain how long it would take the Conservancy to build the accessway, there was substantial evidence the Lents delayed the Conservancy's efforts, which in turn delayed the public's ability to use the easement to access the beach.[18]

And there was other evidence showing the harm the Lents caused was proportional to the penalty. It was undisputed that

---

[18]     Citing a letter written by an engineer and submitted by the Lents in support of their defense during the Commission

57

there is no public access to the beach near the Lents' property; the beach is part of a three-mile stretch of the coast with no public access, with the closest public access point a mile away from the Lents' property. There is no question the state places significant value on the public's right to access the coast. "[T]idelands—lands between the lines of mean high tide and mean low tide—are owned by the public," which the state holds "in trust for the people for their use . . . ." (*State of California v. Superior Court (Lyon)* (1981) 29 Cal.3d 210, 214.) Both the California Constitution and Coastal Act protect the public's right to access the coast (see Cal. Const., art. X, §§ 3, 4; § 30210), and the Coastal Act specifically recognizes the importance of the public's ability to use oceanfront land for recreation (see §§ 30220 ["Coastal areas suited for water-oriented recreational activities that cannot readily be provided at inland water areas shall be protected for such uses."]; 30221 ["Oceanfront land suitable for recreational use shall be protected for recreational use and development unless . . . already adequately provided for in the area."]).

That the harm caused by the Lents' obstructing public access to the coast may be difficult to quantify does not show the penalty is not proportional to the Lents' violation. For example, in *Ojavan II*, *supra,* 54 Cal.App.4th 373 the Commission issued a

proceeding, the Lents contend that "the harm from any delay is uncertain." The trial court was not required to find the statements by the Lents' engineer credible, particularly because they conflicted with the Conservancy's evidence. And even if it is not "certain" the Conservancy can eventually build an accessway in the easement area, there is substantial evidence the Lents at least delayed when the Conservancy can finally determine whether building an accessway is feasible.

permit requiring an owner of 77 lots to recombine them into two lots. (See *id*. at p. 378.) Despite the permit, an investor purchased 54 of the 77 lots and attempted to resell them as individual lots. (*Id*. at p. 379.) The court in *Ojavan II* held that the trial court's $9.5 million penalty against the investor was not disproportionate to the harm, even though the investor caused "'very little or no physical damage to the properties involved,'" because the investor "engaged in activities contrary to the Coastal Act's goal of limiting development." (*Ojavan II,* at pp. 387, 397-398.) Similarly, even if the Lents caused no physical damage to the property by maintaining the structures, the Lents' conduct was inconsistent with the Coastal Act's goal of ensuring public access to the coast and for many years impeded the Conservancy's efforts to provide that access.

### 3. *Penalties Imposed in Similar Statutes*

Citing various provisions of the Penal Code and the Fish and Game Code (see Pen. Code, §§ 374.7, subd. (b) [$250 to $3,000 fine for dumping waste matter into a body of water], 374.8, subd. (b) [$50 to $10,000 fine for knowingly causing a hazardous substance to be deposited into or on a road, another person's land, or waters of the state]; Fish & G. Code, §§ 12007 [$5,000 maximum fine for violating a streambed alteration agreement], 12008 [$5,000 maximum fine for violating certain provisions regarding endangered or protected species]), the Lents contend that the penalty the Commission imposed under section 30821 is disproportionate to the penalty the state may impose for other violations that cause environmental harm. But the statutes the Lents cite impose fines for individual acts, not for ongoing violations like maintaining an unpermitted development

59

that violates the Coastal Act's public access provisions. Moreover, there are plenty of statutes that impose daily penalties for activity that can cause environmental harm—including undertaking activity without obtaining a required permit—some of which impose maximum penalties higher than the maximum penalty the Commission can impose under section 30821. (See, e.g., Fish & G. Code, §§ 5901, 12025.1 [daily penalty of up to $8,000 for constructing or maintaining a device in a stream that impedes passing of fish]; Gov. Code, §§ 66632, 66641.5, subd. (b) [$100 to $10,000 daily penalty for knowingly placing fill, extracting materials, or making any substantial change in use of any water, land, or structure in the San Francisco Bay without obtaining a permit]; Health & Saf. Code, § 25191 [daily penalty of up to $25,000 for the first violation, and $50,000 for the second violation, of provisions relating to the handling of hazardous waste]; Pub. Resources Code, §§ 29610 [$50 to $5000 daily penalty for "intentionally and knowingly commenc[ing] any development in violation of" the Suisun Marsh Preservation Act, § 29000 et seq.], 45023 [$10,000 daily penalty for violating provisions of the Integrated Waste Management Act, § 40050 et seq.]; Wat. Code, §§ 13265, subd. (d) [regional water board may impose a daily penalty of up to $5,000, and the superior court may impose a daily penalty of up to $25,000, for discharging hazardous waste], 13385, subd. (b)(1) [daily civil liability of up to $25,000 for violations of the federal Clean Water Act, 33 U.S.C. § 1251 et seq.].) And courts have rejected excessive fine challenges to civil penalties of several million dollars imposed under statutes authorizing daily penalties like the daily penalty the Commission imposed here. (See *Pacific Gas*, *supra*, 237 Cal.App.4th at pp. 866-867 [$14.35 million penalty against a

60

gas pipeline operator for failing to report information]; *People v. Braum, supra*, 49 Cal.App.5th at p. 359 [$5,967,500 penalty against a landlord who leased property to marijuana dispensary operator in violation of local ordinance]; *Ojavan II, supra*, 54 Cal.App.4th at p. 398 [$9.5 million penalty against an investor for violations of Coastal Act].)

4.     *Ability To Pay*

Although the defendant's ability to pay is a proper factor for the court to consider when analyzing whether a penalty violates the federal and state constitutional prohibitions on excessive fines, the defendant has the burden of proving his or her inability to pay. (See *People v. Cowan* (2020) 47 Cal.App.5th 32, 49-50, review granted June 17, 2020, S261952; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96, review granted Nov. 13, 2019, S257844; cf. *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721, 728-729 [to obtain penalties for violations of the unfair competition law and false advertising law, the government was "not required to present evidence of defendants' wealth" where the relevant statutes did not state that the defendant's ability to pay was "essential for determining the penalty"].) During the Commission proceedings, the Lents never argued or submitted any evidence they could not pay a fine of up to $8,400,000, even though Commission staff notified them prior to the hearing the Commission could impose such a fine. The trial court stated in its order on the Lents' petition that the Lents (again) did not contest their ability to pay the penalty, and the Lents make no showing on appeal they submitted any such evidence in the trial court. The Lents simply state, without explanation, they "are prepared" to present evidence on "their

61

inability to pay a substantial fine" if the matter is remanded. The Lents failed to meet their burden.

## DISPOSITION

The judgment is reversed.  The superior court is directed to vacate its order granting the petition in part and to enter a new order denying the petition.  The parties' motions for judicial notice are denied.  The Commission is to recover its costs on appeal.


SEGAL, J.


We concur:



PERLUSS, P. J.



FEUER, J.